**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William H. BEER,
Defendant-Appellant.**

No. 74-3569.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1975.

Robert V. Williams, James M. McEwen, Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Terrance Smiljanich, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and WISDOM and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

Defendant appeals a conviction under an indictment charging him with knowingly and wilfully making a false statement to the Federal Deposit Insurance Corporation (FDIC) in violation of 18 U.S.C., § 1001.[1] The indictment alleges in substance that in completing an Officer's Questionnaire, FDIC Form 56–19, submitted to the Federal Deposit Insurance Corporation, Beer falsely answered "none" to Question 4, which read as follows:

"List all extensions of credit made since last examination for accommodation of others than those whose names appear on bank's records or on credit instruments in connection with such extensions."

The indictment charges that Beer did, in fact, know of such an extension of credit which had been made for his own accommodation subsequent to the last bank examination, and that his name did not appear on bank records in connection with the transaction. The defendant was convicted in a non-jury trial and sentenced to two years of unsupervised probation and fined $10,000.

On the essential element of materiality we find the government's case insufficient and that it was an improper and overly broad application of § 1001; therefore, we reverse.

I

*Facts of the Case*

At the time of the charge in question, Beer was President of the Venice-Nokomis Bank and Trust Company located in Venice, Florida, a bank whose deposits were insured by the FDIC. Beer and one Robert Oakley jointly owned a small airplane in which Beer would frequently take Oakley, a nonpilot, to visit the latter's family in Gainesville, some distance away. Oakley testified that he wished to purchase a larger, faster plane for this purpose; so he and Beer bought a 1966 Beechcraft in February, 1970. The money for the plane was obtained by a $28,000 loan from the Venice-Nokomis Bank to Oakley, with Beer acting as the loan officer. Oakley was shown as the only obligor on the loan, and the collateral was indicated to be a "Trust Agreement". The only specification given to the term "Trust Agreement" as it applied to this particular loan was the word "Secured" which appeared on the bank's ledger card along with the penciled notation "1966 Airplane".

One week later, on February 26, 1970, Oakley took out a $360,540.90 loan, with appellant again acting as loan officer. In the blank space on the note where collateral was to be listed was the reference "See Attached List". According to the testimony of an Assistant-Cashier of the bank, no such list could be located. The ledger card on the loan merely listed "Bonds" as collateral. At trial Oakley stated that this was meant to include a stock trust agreement he had with a New York bank. The proceeds from the loan were used to engage in short-term municipal bond trading which was "done by the bank" and generated a profit of $29,200 over the next several months. This gain was then used to retire the original airplane loan.

1. "§ 1001. Statements or entries generally

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

On May 25, 1970, a routine bank examination of Venice-Nokomis was conducted by the FDIC. In the course of the examination, Beer, as President of the bank, was given an FDIC Officer's Questionnaire to complete as part of the examination report. The questionnaire sought to elicit information not otherwise contained in the records of the bank, and was completed by Beer in June, 1970.

Because of Beer's half-interest in and his beneficial use of the airplane, the District Judge found that appellant was "accommodated" by the $28,000 loan, and therefore, that defendant's response to Question 4, detailed above, was knowingly and materially false. The difficulty is that the only evidence of the *materiality* of Beer's answer to Question 4 was the general testimony of John W. Ray, a senior head bank examiner for the FDIC. He testified that the FDIC relies on the questionnaire to provide information not otherwise available in the bank records. Ray was never asked, however, about the potential effect of a false answer to Question 4 upon the functioning of the agency nor did he say what the FDIC might have done had the question been answered truthfully, other than to say that such a false statement would not authorize him to cancel the bank's federal deposit insurance.

To fully understand this case, it should not be ignored that the false statement was but a small facet of the government's original case. The initial indictment contained five counts including conspiracy with Oakley and one other defendant to misapply bank funds, misapplication of funds in connection with $360,540.90 loan to Oakley, and false bank entries. The charges against the two co-conspirators were dismissed on the government's motion, as were all counts against Beer except for the misapplication of funds and the false statement. He was then acquitted of the former and convicted of the latter. Thus all the specific substantive charges were either tossed out or found to be unmeritorious.

## II

### *Origin and Scope of § 1001*

The origin and history of the false statement statute are thoroughly detailed in *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); and particularly in *United States v. Stark,* 131 F.Supp. 190 (D.Md., 1955). Enacted over a century ago in the "wake of a spate of frauds upon the Government", the statute was clearly directed at false pecuniary claims against the United States. It remained in that form until 1934 when the Department of the Interior was experiencing great difficulty in regulating "hot oil" shipments. In order to provide a penal sanction for deliberately supplying false information to regulatory departments, the words "cheating and swindling" were deleted, and the statute was broadened to its present form to include "any matter within the jurisdiction of any department or agency of the United States", manifesting "the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described".

The statute is necessarily couched in very broad terms. Congress could not hope to foresee the multitude and variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex governmental machinery, a complexity that renders vital the truthful reporting of material data. When dealing with such a pervasive, all-encompassing statute, however, the courts must be extremely careful to insure that reasonable limits are observed. This is merely a restatement of the canon of construction that criminal statutes are to be strictly construed. *Smith v. United States,* 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959); *United States v. Strauss,* 5 Cir., 1960, 285 F.2d 953. In order to exclude "trivial" falsehoods from the purview of the statute, the courts have read a requirement

of materiality into its second clause, the test being whether a statement "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made". Materiality is therefore a matter of law. *United States v. Krause,* 5 Cir., 1975, 507 F.2d 113, 118; *Rolland v. United States,* 5 Cir., 1953, 200 F.2d 678, *cert. denied* 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383 (1953); *United States v. Jones,* 8 Cir., 1972, 464 F.2d 1118, 1121–22; *Brethauer v. United States,* 8 Cir., 1964, 333 F.2d 302, 306; *Blake v. United States,* 8 Cir., 1963, 323 F.2d 245, 246; *Gonzales v. United States,* 10 Cir., 1960, 286 F.2d 118, 122. *See United States v. Lambert,* 5 Cir., 1974, 501 F.2d 943, 946.

The judiciary has also found it necessary to narrow the parameters of the statute through the "exculpatory no" doctrine. Numerous cases have found that essentially negative answers to questions propounded by investigating government officers are not statements within the meaning of § 1001 in the absence of some affirmative, aggressive, or overt falsehood on the defendant's part. *Paternostro v. United States,* 5 Cir., 1962, 311 F.2d 298, 309 (negative answer given to Special Agents of the Internal Revenue Service); *United States v. Bedore,* 9 Cir., 1972, 455 F.2d 1109, 1110–11 (denial of identity to FBI agent); *United States v. Philippe,* 173 F.Supp. 582 (S.D.N.Y., 1959); *United States v. Davey,* 155 F.Supp. 175 (S.D.N.Y., 1957); *United States v. Stark,* 131 F.Supp. 190 (D.Md., 1955); *United States v. Levin,* 133 F.Supp. 88 (D.Colo., 1953). *See United States v. Lambert, supra. Contra United States v. Ratner,* 9 Cir., 1972, 464 F.2d 101 (negative answers to Internal Revenue Agents); *United States v. McCue,* 2 Cir., 1962, 301 F.2d 452, *cert. denied,* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962) (negative statements to Internal Revenue agents); *Frasier v. United States,* 1 Cir., 1959, 267 F.2d 62 (denial of communist affiliation on a loyalty certificate).

In its detailed analysis of the applicable cases, this Circuit found the reasoning of *Stark, Levin, Davey,* and *Philippe* persuasive in its *Paternostro* decision. Therein the Court quoted the District Court opinions at length concerning the severity of § 1001's sanctions as opposed to those for perjury, the potential for self-incrimination raised, and the generality of the statute's terms. These cases are indicative of the concern of the courts when grappling with broad language which punishes a knowingly false statement that has the "capacity" to deceive rather than an affirmative statement "intended" to deceive. We summed up the issue in *United States v. Moore,* 5 Cir., 1950, 185 F.2d 92, when we stated:

"Under familiar canons of construction a penal act of the harshness and rigor of this one—a harshness and rigor so great that, as the revisors point out in the notes to the Code as amended in 1948, the punishment was deliberately reduced from ten to five years—the statute will not be stretched beyond, it will be strictly confined within, the fair meaning of its terms."

### III

### *Materiality of the Statement*

In view of these indications of strict construction, this Court is bound to construe the provisions of the statute within reasonable limits as to what constitutes a material false statement. As noted in the recitation of the facts, the only evidence of materiality was the general statement by the bank examiner that the FDIC relied upon the questionnaire, without stating what for or for what purpose.

The early case of *Markham v. United States,* 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed. 441 (1895), held that it was not necessary to set forth in the indictment all the circumstances which render the false statement material to the matter in issue. The government must nevertheless establish the element at trial.

Also, the cases previously cited on the requirement of materiality are in agreement that the agency need not actually have relied or acted to its detriment upon the false statement, but the government must still show that the statement had the capacity to influence a determination required to be made.

The testimony of Ray, the bank examiner, reveals no evidence of how the particular statement here could have affected any decision of the FDIC other than that he would not have been authorized to cancel the bank's insurance because of it.

■ In weighing the materiality of a false statement which may make the declarant liable for a $10,000 fine and five years imprisonment, we are constrained to require a reasonable showing of the potential effects of the statement. If the functioning of a department or agency would not have been materially affected had it relied upon the statement, then the statement must necessarily be immaterial.

■ Although this requirement of specificity has not been alluded to as such in prior cases, the evidence or nature of the statements were such in those cases that the potential for subversion of an agency's functioning could readily be inferred. From the record in this case that inference is simply absent. Only a few weeks after Beer made the statement the loan in question was repaid and the bank suffered no loss. If, in the opinion of the bank examiner, the loan was questionably collateralized, what would the FDIC have done had it learned of the accommodation from the questionnaire? How could its functions, or some determination which it was required to make, have been impaired? From the evidence in this record we cannot answer these questions with that degree of certainty sufficient to justify a

felony conviction under the terms of the statute.

The materiality of a statement rests upon a factual evidentiary showing, but the ultimate decision is a legal one. If the factual showing is insufficient, a legal element of the offense is missing, and courts then direct a verdict of acquittal.

Since there is no showing that Beer's statement was a material one we find it unnecessary to reach or decide the other assignments of error. We do note, however, that the word "accommodation" as employed in the context of the questionnaire is beset by vagueness and ambiguity. While it might be sufficiently explicit to cover the particular facts of this case, Beer himself being the allegedly accommodated party, it may reasonably be questioned whether the term includes anything other than a sham transaction in some other factual setting.

## IV

### Impropriety of the Charge

■ As previously stated, § 1001 is to be strictly construed, and when there had been some indication by Congress of an intention to narrow its parameters, that intention must be recognized by the courts. For example the legislature could not possibly have intended to supplant the perjury statute, 18 U.S.C., § 1621, with the false statement statute. If one lies under oath before a competent tribunal in a matter within the jurisdiction of a department or agency, he should be tried for perjury, the more specific offense. This is merely a recognition of the rule of construction that a specific statute controls a more general one.

■ In the case at bar, defendant was convicted of making a false material statement to the FDIC which had the *capacity* to deceive that agency. Section 1005 of Title 18 [2] declares the making of

2. "§ 1005. Bank entries, reports and transactions

    \*    \*    \*    \*    \*    \*

   "Whoever makes any false entry in any book, report, or statement of such bank with

intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corpo-

a false entry in a report intended to deceive the FDIC a criminal act. The former is punishable by twice the fine of the latter. It appears illogical that Congress intended to punish the maker of a statement which has the *capacity* to deceive more severely than an *intentional* deception of the same agency. The facts of this case come squarely within the ambit of § 1005. In the case of *Crenshaw v. United States,* 6 Cir., 1940, 116 F.2d 737, the same Officer's Questionnaire which is at issue here was held to be a "report" for purposes of § 1005, and the answer "No" in response to a question as to whether non-interest-bearing loans had been extended to be intentionally deceptive. An intent to deceive was legally inferred from the knowing falsity of the answer, evidence having been introduced that if the loans had been listed, the FDIC would have inferred that the borrowers were in financial difficulties. If further investigation by the examiners had sustained that inference, the bank would not have been allowed to carry such high risk loans and they would have been charged off.

We do not mean to imply that the facts in the instant case are sufficient for a prima facie showing of guilt in a § 1005 prosecution. *Crenshaw* is cited only to illustrate that § 1005 is a more appropriate vehicle for testing the legality of the defendant's actions. Congress has specifically addressed itself to deceptions sought to be perpetrated upon the FDIC by means of false reports.

Given the well recognized antagonism toward general, open-ended criminal statutes, and the presence here of a specific legislative enactment, the prosecutor might well have proceeded under the specifically applicable statute, 18 U.S.C., § 1005.

Of course, we do not reverse this conviction for the failure to do so, but rather because there was a failure of proof on the essential element of materiality.

ration, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

The judgment of conviction is Reversed.

Reversed.

"Shall be fined not more than $5,000 or imprisoned nor more than five years, or both."
\* \* \* \* \* \*