**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph LICHENSTEIN and Leo Bella,
Defendants-Appellants.**

**No. 78–5752.**

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1980.

Rehearing Denied March 10, 1980.

Griffin Bell, Jr., George N. P. Pahno, Savannah, Ga., for defendants-appellants.

Kathrine L. Henry, Melissa S. Mundell, Wm. H. McAbee, II, Asst. U. S. Attys., Savannah, Ga., for plaintiff-appellee.

Before WISDOM, TJOFLAT and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants Bella and Lichenstein were charged with knowingly and willfully submitting a false statement to a government agency, 18 U.S.C. § 1001, by falsely designating as "vessel supplies" 1,150 cases of bonded scotch whiskey on a United States Customs form, and with conspiring to accomplish the same, 18 U.S.C. § 371. At trial the jury returned verdicts acquitting both men on the substantive count, but convicting on the conspiracy count. Appellants challenge their convictions on a variety of grounds: (1) that there was insufficient evidence either to avert defense motions for judgments of acquittal or to support the jury verdict; (2) that the trial judge erred in finding the falsification to be "material"; (3) that the inconsistency of the jury verdicts requires reversal; (4) that the longstanding practice of Customs in allowing without question the lading of similarly large consignments of whiskey and other goods as vessel supplies actively mis-

led appellants regarding the criminality of falsely designating goods as vessel supplies; (5) that they were selectively prosecuted; and (6) that the prosecutor irreparably tainted the trial with recurrent references to extrinsic "smuggling" activities. We affirm the convictions.

Leo Bella, president of Ambrasco International Export Corporation of New York, primarily engages in the brokerage and exportation of machinery to South America. In September 1975 Bella arranged with Joseph Lichenstein, president of the Dave Streiffer Company—a ship chandler, a dealer in vessel supplies—to have 900 cases of scotch whiskey, purchased by Bella in Switzerland, imported under Streiffer Company's name and stored in the latter's bonded warehouse in New Orleans. In November 1975 Bella telephoned Lichenstein again to arrange the transfer of these 900 cases, plus an additional 250 cases to be purchased from Streiffer stock, to the port of Savannah, Georgia, to be laden aboard the Greek freighter CAPETAN GIANNIS. Bella inquired whether the whiskey might be transported and laden as "vessel supplies" (items to be consumed on board ship) rather than export cargo; Lichenstein assured him that it could be so designated even though both men knew the GIANNIS to be bound only for a fourteen-day voyage to Brazil with a crew of twenty-five.

In order to obtain release of the bonded whiskey from the Streiffer warehouse for transit to another United States port, Lichenstein was required to submit to Customs several prescribed forms 7512, indicating the eventual destination of the whiskey to be vessel supplies to be laden aboard the GIANNIS in Savannah, the quantities to be withdrawn, and the mode of transit to Savannah.[1] A Customs Warehouse Officer,

1. Bonded goods, such as the 900 cases imported by Bella and the other stores in the Streiffer warehouse, are goods that come into port in this country only to be shipped elsewhere, rather than being distributed or consumed in the United States. Accordingly, such goods are exempt from United States import duties. Because of the potential revenue loss from any

abuse of this exemption, bonded goods are subject to careful, constant supervision by Customs to prevent their being funnelled, untaxed, into domestic trade. Upon entry they must be stored in a bonded warehouse, such as Streiffer's, licensed by the government and regulated by Customs. Customs must also oversee any movement of the goods, either for lading direct-

Oscar H. Staines, stationed at Streiffer's bonded warehouse then released the whiskey according to these forms, and it was transported to Savannah via common carrier in sealed trailers. A Customs inspector in Savannah then validated the forms 7512 on November 18, 1975, to acknowledge that the whiskey had arrived satisfactorily and had not been diverted into domestic trade. Upon noticing the excessive quantity being laden as vessel supplies, however, he notified two other Customs special agents. These agents briefly questioned the captain of the GIANNIS about the intended lading of 1,150 cases of scotch as vessel supplies, and thereafter decided to question Bella in New York. For reasons not made clear at trial, the captain subsequently refused to have the suspect whiskey laden aboard, and the GIANNIS departed from Savannah later that same evening, November 18, before Customs' interviews with Bella could be completed. After speaking with Bella and Lichenstein, Customs seized the whiskey on November 20, 1975, and the indictments for false statements and conspiracy followed.

## I.

■ The standard of review for sufficiency of the evidence to support either the jury's verdict or the trial court's denial of defendants' motion for acquittal is the same: whether, viewing the evidence and all reasonable inferences most favorably to the prosecution, a reasonable jury could find the evidence inconsistent with all reasonable hypotheses of the defendants' innocence. *United States v. Zicree*, 605 F.2d 1381, 1385 (5th Cir. 1979) (applying this standard to review of denial of motion for acquittal); *United States v. Duckett*, 550 F.2d 1027, 1030 (5th Cir. 1977) (applying this standard to review of jury verdict).

■■ To sustain a conspiracy conviction there must be proof (1) of an agreement among two or more persons (2) to accomplish something that constitutes an offense against the United States, and (3) an overt act by one of them in furtherance of the

conspiracy. *United States v. White*, 569 F.2d 263, 266 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). As to each conspirator, the prosecution must show the existence of a conspiracy and that the accused knowingly participated in it. *United States v. Barrera*, 547 F.2d 1250, 1256 (5th Cir. 1977). There is little controversy that the required proof was given for the majority of these elements. Direct evidence, predominantly admissions by Bella and Lichenstein themselves, that Bella requested Lichenstein to withdraw the 1,150 cases of whiskey from his bonded warehouse as "vessel supplies" to be laden aboard the GIANNIS under this label, that Lichenstein responded to this inquiry that it would be "no problem," and that, accordingly, he had the whiskey removed from his warehouse and shipped to Savannah pursuant to Customs forms 7512 that he had caused to be executed falsely, designating the whiskey as vessel supplies as per Bella's request, amply demonstrates an agreement and knowing participation by both parties, as well as a key overt act in furtherance of the conspiracy (execution of the Customs forms).

■ Appellants, however, contend there was insufficient proof of any unlawful purpose of their agreement—that is, they argue that their goal of representing the whiskey to Customs as "vessel supplies" would not, in the context of this case, constitute a violation of 18 U.S.C. § 1001. The elements of an offense under § 1001 are (1) a statement, that is (2) false (3) and material, (4) made with the requisite specific intent, (5) within the purview of government agency jurisdiction. *United States v. Lange*, 528 F.2d 1280, 1287 (5th Cir. 1976). Aside from the finding of materiality, a question of law examined below, appellants seriously controvert only the proof of specific intent.

■ Section 1001 proscribes only deliberate, knowing, willful false statements. *Lange*, 528 F.2d at 1288. The statement

---

ly aboard a ship for export or transportation to another port for eventual export. No taxes are

paid upon the export of such goods either as vessel supplies or as manifested cargo.

must have been made with an intent to deceive, a design to induce belief in the falsity or to mislead, but § 1001 does not require an intent to defraud—that is, the intent to deprive someone of something by means of deceit. *United States v. Godwin*, 566 F.2d 975, 976 (5th Cir. 1978) (per curiam). To sustain the conviction of conspiracy to violate § 1001, the government must have proved at least this same degree of criminal intent as required for the substantive offense. *United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir. 1979) (requiring proof of specific intent to sustain conviction of conspiracy to commit a specific intent crime). In a sworn statement given to a Customs agent and entered at trial (Gov't exh. no. 17), appellant Bella admitted that the whiskey "had to be invoiced as ship stores" in order to avoid its being entered on the export manifest "because there was no Brazilian import license available." Lichenstein admitted having stated in conversation with this same agent that he "didn't believe the crew would drink that much whiskey" and that "the whiskey was going into South America" (Supp.R. at 186–87, 356). These acknowledgements by appellants, coupled with the common sense inference that a twenty-five man crew on a fourteen-day voyage could not ingest 1,150 cases of scotch, adequately demonstrate the falsity of the designation of these goods as "vessel supplies" and appellants' knowledge of that falsity. Moreover, appellants deliberately made these misrepresentations, perhaps, as Bella's statement suggests, to facilitate unlading of the whiskey in South America.

Appellants creatively contend, however, that they made their knowing falsification with no intent to deceive. Rather, they claim, they acted in reliance on a longstanding practice of Customs to accept, unquestioningly, excessive quantities of goods as vessel supplies. Customs is charged with enforcing 15 C.F.R. § 371.9, a regulation that restricts the lading on board ships of goods as "ship stores" or vessel supplies to "reasonable quantities." Appellants adduced uncontroverted evidence that Customs had traditionally construed this provision very liberally, illustrating this by several transactions in which appellants, themselves, had been involved.[2] In addition, appellants introduced evidence of an intra-agency communication between Customs Warehouse Officer Staines, stationed at the Streiffer warehouse, and his superiors to the effect that no limits were to be enforced on the quantities of whiskey allowed to be designated as vessel supplies (Def. exh. no. 7). In this context appellants argue that they had no intent to deceive Customs, but were simply acting in conformity with past practice. Their characterization of 1,150 cases of whiskey as vessel supplies for so few men for such a short voyage was, they argue, inherently unbelievable, incapable of deceiving anyone, and simply further proof of the fact that they never intended for Customs actually to believe the designation, so long as Customs treated this whiskey in the same way it had treated past consignments. In essence, appellants contend that they had no intent to "deceive", under the *Godwin* definition of that term as a design to mislead or to cause to believe falsely, because Customs' past practice indicated that it traditionally placed no reliance on and *formed no belief* as to the truth of any designation as vessel supplies, but merely accepted such designations and acted ministerially according to them.

We do not believe the concept of intent to deceive under § 1001 may be so narrowly or literally drawn. It is undisputed that by falsely characterizing the whiskey as vessel supplies, appellants would have circumvented the Customs requirement that all goods exported, other than vessel supplies, be the

2. For example, Lichenstein presented invoices (Def. exh. nos. 3, 4), showing that in 1973 his company had loaded 700,000 cigarettes and 1,150 cases of scotch aboard one vessel, and Lichenstein testified he had encountered no resistance from Customs to designating this as ship stores. Similarly, Bella recounted having arranged a sale as vessel supplies of 500 cases of whiskey to an Argentine warship.

subject of an export declaration (an additional Customs and Bureau of Census form) and that such goods be entered on the ship's outward manifest, a list available to customs inspectors of other ports and countries of all cargo on board, save ship stores. Bella's statement indicating the absence of import licenses in Brazil to be the reason the whiskey had to be laden as ship stores (undeclared on the GIANNIS's outward manifest) suggests the avoidance of these formal requirements to have been the prime motivation behind the falsification of the Customs forms. Thus, whether or not appellants intended to deceive Customs in a subjective or literal sense, they clearly intended to manipulate and pervert its functioning by means of their falsification. We believe that it was just this type of intent, to disrupt agency functions by false statements, that § 1001 was designed to proscribe. *Cf. United States v. Goldfine*, 538 F.2d 815, 820 (9th Cir. 1976) (stating the capacity of a false statement to impair the functions of an agency to be the hallmark of materiality bringing the statement within the proscription of § 1001).

Moreover, even under appellants' theory, subjective deceit arguably was also shown. Large quantities are not always obviously inconsistent with the supplies being ship stores. Testimony of several witnesses indicated that quantities that would be excessive for one ship's supplies would be allowed where that ship was procuring for a group of ships, for instance a merchant or military fleet. Customs Warehouse Officer Staines testified that he knew nothing about the size of the GIANNIS, moored at Savannah, or the nature of its procurement of supplies when he released the whiskey in New Orleans. One might infer that he relied for the determination of the propriety of the procurement on the Customs officials in Savannah where the goods actually were to be laden aboard the GIANNIS. Staines asserted, however, that had he known the whiskey was not to be used as vessel supplies he would not even have released them for transportation to Savannah as such. Therefore, the falsified forms 7512 submitted to Staines by Lichenstein did, in fact, carry a capacity to deceive.

Accordingly, we find sufficient evidence of specific intent, as well as of the other elements enumerated above, to support the trial court's denial of the motions for acquittal and the jury's verdict.

## II.

■■ In addition to attacking the jury verdict, appellants challenge the trial court's finding, as a matter of law, that the falsification about which they conspired was a material false statement under § 1001. While materiality is not an explicit requirement of the second, false statements, clause of § 1001, courts have inferred a judge-made limitation of materiality in order to exclude trifles from its coverage. *United States v. Beer,* 518 F.2d 168, 171 (5th Cir. 1975). A material false statement under this rule is one that is *capable* of affecting or influencing the exercise of a government function. *United States v. Goldfine,* 538 F.2d 815, 820 (9th Cir. 1976); *United States v. McGough,* 510 F.2d 598, 602 (5th Cir. 1975). That, as here, the government is not actually influenced by the statement is immaterial. *Goldfine,* 538 F.2d at 820–21. *Accord, Beer,* 518 F.2d at 172 (dictum). The potential effect on the government need not involve pecuniary loss. *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *United States v. Krause,* 507 F.2d 113, 117 (5th Cir. 1975). The false statement must simply have the capacity to impair or pervert the functioning of a governmental agency. *Krause,* 507 F.2d at 117–18; *United States v. Lambert,* 501 F.2d 943, 946 (5th Cir. 1974) (en banc). Materiality rests upon a factual evidentiary showing by the prosecution. *Beer,* 518 F.2d at 172. The determination is, however, a question of law for the court, *Krause,* 507 F.2d at 118, and therefore subject to complete review, unrestricted by the "clearly erroneous" standard. *See Kaspar Wire Works, Inc. v. Leco Engineering & Machine Co.,* 575 F.2d 530, 533 n. 1 (5th Cir. 1978).

■ Appellants' false designation of the whiskey as vessel supplies obviously fore-

closed its proper designation on the proper export declaration forms as being laden for export. This would have had no tax or other pecuniary effect on the government. However, had it gone undetected, the falsification and avoidance of the export declaration would have allowed evasion of the requirement that goods actually being laden as export cargo be listed on the ship's outward manifest—an indication to customs officials in other countries and other United States ports of the presence on board of the bonded, untaxed whiskey. Moreover, by precluding Customs from accurately recording this whiskey as export goods, appellants prevented them from furnishing to the Bureau of Census, as is their duty, information needed to compile import-export statistics. Pervasive falsifications of this nature obviously would totally pervert these statistics and undermine the efforts of Customs and Census officials assigned to collect the data. This case is therefore unlike *Beer,* the case relied upon by appellants, since in that case the government failed to demonstrate *any* potential adverse effect of the false statement. Thus, falsification of the nature of the whiskey as vessel supplies did have the capacity to impair the functions of Customs, in achieving an accurate declaration of exported cargo, and, through them, the Bureau of Census. The trial judge was, therefore, correct in finding the statement to be material.

### III.

Appellants next argue that the jury verdicts acquitting them of the substantive count, but convicting them of conspiracy were so inconsistent as to require reversal. While acknowledging that ordinarily a verdict of guilty on conspiracy may not be inconsistent with acquittal on the substantive offense, *United States v. Dearden,* 546 F.2d 622, 624 (5th Cir. 1977), appellants argue that since in this case they admitted making the false statement proscribed by § 1001, the jury's acquittal on that count must indicate either a finding that there was no specific intent or that the statement was not false. In either case, they contend the verdict indicates that the object of their conspiracy was not a crime, so the conspiracy was not, itself, illegal.

This argument is without merit. A court may not divine from a general verdict of acquittal such specific findings; such a parsing of hypothesized jury reasoning is an incursion contrary to the sanctity accorded jury verdicts in our criminal system. *See generally, United States v. D'Angelo,* 598 F.2d 1002 (5th Cir. 1979). Juries in criminal cases in this country are free to render verdicts that are inconsistent or even the result of mistake or compromise. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Dudley,* 581 F.2d 1193, 1199 (5th Cir. 1978). Thus, any apparent inconsistency between verdicts on the two counts of the indictment does not undermine convictions on the conspiracy count on which appellants were found guilty. "Each count is separately considered and, if it is supported by the evidence, may stand." *United States v. Romeros,* 600 F.2d 1104, 1105 (5th Cir. 1979) (per curiam; upholding conspiracy conviction over appellant's argument that acquittal on substantive count constituted a jury finding that the object of the conspiracy was not a federal crime).

The decision in *Marquez-Anaya v. United States,* 319 F.2d 610 (5th Cir. 1963) (per curiam), relied upon by appellants, is not contrary to this rule. There this court overturned a conviction on one count (accepting narcotics in this country without paying a transfer tax) of a three-count indictment where it determined that convictions on the other two counts (smuggling the narcotics into the country) logically excluded conviction on the first. In that situation the court merely determined that sufficient evidence existed to support the verdicts on the smuggling counts and affirmed those convictions. *Accord, Thomas v. United States,* 314 F.2d 936, 939 (5th Cir.), *cert. denied,* 375 U.S. 849, 84 S.Ct. 105, 11 L.Ed.2d 76 (1963). The rule in these cases, that one may not be convicted and sentenced on logically contradictory *charges,* does not bear upon the *Dunn* rule upholding

an adequately supported conviction despite apparent inconsistency in the findings of guilty and not guilty on different counts of a two-count indictment—particularly in light of the deference accorded juries to return verdicts based, for instance, on compromise. *Glenn v. United States,* 137 U.S. App.D.C. 120, 420 F.2d 1323 (D.C.Cir. 1969), another case relied upon by appellants, involving an ambiguous single verdict, is also inapposite here. Therefore, the jury's verdict on the conspiracy count having been held in Section I, above, to have been adequately supported by the evidence, we hold the convictions on that count not to be vitiated by the not guilty verdict on the substantive count.

## IV.

■ Aside from its bearing on *mens rea,* appellants contend that the longstanding Customs practice of allowing the shipment of excessive quantities of goods characterized as ship stores or vessel supplies should in its own right bar this prosecution. Appellants maintain that, particularly with reference to the transactions in which they were involved, by pursuing this practice Customs actively misled them to believe there would be no punishment for misrepresenting cargo as vessel supplies despite the law and regulations to the contrary. For this they rely on *United States v. Laub,* 385 U.S. 475, 487, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967) and *Raley v. Ohio,* 360 U.S. 423, 438, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), both of which held that the government may not prosecute for the commission of an act about the criminality of which it has "actively misled" defendants or issued "inexplicably contradictory commands."

The Court in both *Raley* and *Laub* was, however, addressing circumstances where some authoritative voice in the government had issued official, express assurances that no criminal sanctions would attach to the acts in question. A case much closer to this one is *United States v. Pennsylvania Industrial Chemical Corporation,* 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). There the Supreme Court remanded under *Raley-*

*Laub* to allow the defendant to show that it had relied in good faith on a longstanding policy of the government agency charged with enforcement of the statute involved not to apply its sanctions to the particular activity engaged in by defendant—notwithstanding the activity's being literally comprehended by the terms of the statute. Even there, however, the agency had issued public regulations, upon which defendant allegedly had relied, expressly circumscribing its enforcement of the statute involved.

Here appellants rely simply on Customs' past inactivity in failing to object or to prosecute for abuse of the "reasonable quantities" limitation on vessel supplies and on widespread exploitation of that inactivity by shippers. While appellants suggest that they had in the past received some affirmative indications that no limits would be enforced, none were proved at trial. There was introduced evidence of an intra-agency communication to Customs Warehouse Officer Staines (Def. exh. no. 7), indicating he was to impose no limit on the quantity of liquor, but there was no proof that this policy had been expressly articulated to Lichenstein or Bella. More importantly, the question of quantities aside, there was no evidence that Customs ever acquiesced in the misrepresentation of vessel supplies when the characterization was actually known to be false; thus a posture of total indifference may not even be suggested. "[G]overnmental silence is not 'affirmative assurance that punishment will not attach' and a mere absence of prior prosecutions does not constitute 'active misleading' " even in the face of widespread practice of the proscribed activity. *United States v. Mann,* 517 F.2d 259, 270 (5th Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). In *Mann* this court refused to apply the *Raley-Laub* rule to a situation of past governmental acquiescence in widespread illegal bank loan activity even though regular bank examinations had failed to alert the bank that the practice was a violation of the law and despite evidence of intra-agency government memoranda indicating that those engaged in the proscribed activity should not be prose-

cuted. *Id.* at 269–70. *See also United States v. Clark,* 546 F.2d 1130, 1135 (5th Cir. 1977) (denying application of *Raley-Laub* to a false statements case). Accordingly, we hold that appellants were not so misled by Customs as to preclude prosecution for their deliberate misrepresentation.

### V.

Appellants also contend they were the victims of selective prosecution. They argue that even though a Savannah ship chandler, Bruce P. Ford, had agreed with them to sell 150 cases of scotch to be added to appellants' 1,150 cases for lading aboard the GIANNIS, he was not indicted for conspiracy.

 Though selective prosecution, if based on improper motives, can violate constitutional guarantees of equal protection,[3] selective enforcement in and of itself is not a constitutional violation. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Therefore, to support a defense of selective prosecution, one must establish (1) that others similarly situated have not generally been prosecuted and (2) that the government's discriminatory selection of him is invidious, or in bad faith—that is, based on constitutionally impermissible considerations, such as race or religion. *United States v. Johnson,* 577 F.2d 1304, 1308 (5th Cir. 1978).[4] Here appellants showed that Ford was willing to participate in the sale of the scotch. They did not, however, adduce evidence to show that he was willing to participate in the misrepresentation. In fact, the forms 7512 on which the original falsification had occurred were executed in New Orleans before Ford's potential participation began. This, coupled with the decision of the captain of the GIANNIS not to buy Ford's whiskey, effectively deprived

him of any opportunity ever to participate in any falsification. Appellants also contend that the captain of the GIANNIS, alleged to be the instigator of the entire scheme, should have been prosecuted as well, but there was ample indication at trial that, all else aside, the government simply had not been able to locate the captain in United States territory since the incident. Thus, appellants have not borne their burden of proving even the first prong of the test, selectivity, much less the invidiousness of any selectivity.

### VI.

Finally, appellants contend that the prosecutor so tainted the proceedings below by repeatedly referring to the "smuggling" of the whiskey into Brazil, what she believed to be the intended goal of appellants, that a new trial must be awarded. On at least seven occasions defense counsel objected to prosecution references to "smuggling" or illegal import into Brazil, three times unsuccessfully moving for a mistrial. On each occasion the trial judge sustained the objections and cautioned the jury to disregard references to smuggling, twice he gave curative instructions to the effect that smuggling or importing into Brazil was not an offense against the United States, and that the jury should completely disregard any references to such activity.

 To warrant a new trial prosecutorial misconduct in the form of improper comment or questioning "must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Blevins,* 555 F.2d 1236, 1240 (5th Cir. 1977), *cert. denied,* 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). Moreover, while each case must be judged on its own facts, prejudicial comment, such as the ref-

---

3. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (incorporating equal protection guarantees into the fifth amendment due process clause).

4. This heavy burden imposed upon defendants is indicative of the policy of restraint that derives from a respect for executive, prosecutorial discretion implicit in constitutional separation of powers. *United States v. Hayes,* 589 F.2d 811, 819 n. 3 (5th Cir. 1979).

erences here to possible extrinsic effects or violations, may be rendered harmless by curative instructions to the jury. *See, e. g., United States v. Cook,* 586 F.2d 572, 578 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979) (comments regarding endangering military personnel as a result of defendant's fraud held cured by instruction); *United States v. Mikka,* 586 F.2d 152, 155–56 (9th Cir. 1978), *cert. denied,* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979) (prosecution's suggestion that convicted felon possessed firearm to commit more crimes held cured by admonition). *But see, e. g., United States v. Herberman,* 583 F.2d 222, 230–31 (5th Cir. 1978) (prosecution held to have made too many improper suggestions and to have introduced too much improper evidence to be cured by instruction).

This court condemns prosecutorial attempts to influence a jury improperly by reference to more flamboyant, but extrinsic and unproved, activities of defendants. However, in light of the relatively strong evidence of guilt of deliberate misrepresentation in this case, coupled with the court's curative instructions, we do not believe that the cumulative effect of these few comments over the course of a three-day trial tainted the proceedings to a degree requiring the grant of a new trial.

Accordingly, for the reasons set forth above, the convictions of appellants are affirmed.

AFFIRMED.