**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 92-7778

---

United States of America,

Plaintiff-Appellee,

VERSUS

Lynn Williams,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Southern District of Mississippi

( January 13, 1994 )

Before WISDOM, HIGGINBOTHAM, and JONES, Circuit Judges.

WISDOM, Circuit Judge:

The appellant/defendant, Lynn Williams, originally was indicted on August 7, 1991, on charges of conspiracy to embezzle funds belonging to a labor union pension plan under 18 U.S.C. § 371 and embezzlement of those pension funds under 18 U.S.C. § 664. A series of superseding indictments additionally charged him with making false statements to a federally insured bank under 18 U.S.C. § 1014. On September 10, 1992, the trial court denied the defendant's motion to dismiss. In that motion, Williams alleged prosecutorial misconduct, a lack of materiality of the alleged

1

false statements, and violations of his rights under the Speedy Trial Act[1].

Williams was charged along with several co-defendants, all of whom pleaded guilty.[2] He refused to do so, presumably because his participation in the criminal enterprise consisted only of lending his friends money and, on two fateful occasions, signing documents that they presented to him. A jury nonetheless found Williams guilty of one count of conspiracy and three counts under § 1014; the jury found him not guilty on the two pension fund theft counts. After denying Williams's motion for judgment of acquittal or for a new trial, the district judge sentenced Williams to 21 months in prison. Williams appeals from that conviction. We AFFIRM his conviction for conspiracy but VACATE his convictions under § 1014.

## I.  Background

Although the charges against Williams are not particularly complex, some background on the other defendants's relationships and business ventures is helpful to understand their context. Eugene Sykes, of Baton Rouge, Louisiana, owned and operated Morning Treat Coffee Co. for two years until it filed for bankruptcy in 1985. In July of that year, Charles Sykes (Eugene's brother) formed Southern Coffee Co. as a distinct successor to Morning

---

[1] 18 U.S.C. § 3151 et seq.

[2] Prior to the second indictment, co-defendants Charles and Eugene Sykes pleaded guilty. Prior to the third indictment, co-defendants Andrew Cutler, Wilson Evans, and Robert Matthews pleaded guilty, leaving Williams the sole remaining defendant.

2

Treat; Southern bought the remaining assets of Morning Treat. Although Charles owned 100% of Southern Coffee, he made Eugene president. Eugene spent his time handling the day-to-day affairs of Southern Coffee while Charles continued his main vocation, practicing law and representing labor unions along the Gulf Coast in Mississippi.

In April 1986, Eugene sought additional funding for Southern Coffee. He applied for a loan of two million dollars to the Louisiana Imports and Exports Trust Authority (LIETA), an organization designed to aid small businesses in Louisiana in gaining access to the import and export markets. During this time, Williams, an attorney in Baton Rouge, maintained an ongoing personal and business relationship with Eugene. For example, Williams accompanied Eugene when he went to New Orleans to address the LIETA Board and, further, applied to a bank for a letter of credit for Eugene to pledge as collateral. When that application was rejected, Williams personally borrowed $50,000 and lent the money to Eugene.

Always the entrepreneur, Eugene decided to get into the marble cutting business. In particular, he started China Marble of America, Inc., and sought to buy the Colombus Marble Works of Colombus, Mississippi (with a quarry in Alabama) for $460,000. Eugene told his brother Charles, the attorney, about his interest in the marble venture and enlisted his help in securing funding. Eugene knew that Charles was extremely influential with the unions he represented and might have access to money in their pension

3

funds.

Eventually Eugene gave Charles documents outlining a proposal for the marble venture and proposing plans to build a Morning Treat Coffee plant in Mississippi. The proposal sought interim funding until a loan of one million dollars from LIETA could be consummated. Charles passed the proposal to co-defendants Wilson Evans and Robert Matthews, two trustees of the Gulfport Steamship Company-International Longshoremen's Association Pension Fund ("Fund").[3]

Evans and Matthews may have been blinded by wishful naivete: the proposal came when jobs were scarce. They doubtless saw the marble cutting venture as the source of some much-needed local employment opportunities. The reality, unfortunately, was quite different. The proposal was but a means of misappropriating pension money to secure loans for Eugene's various ventures. In addition, LIETA would never have given money to a venture in Mississippi (the organization was founded to aid small businesses in Louisiana, as the "L" in LIETA indicated).[4] Evans and Matthews wrote Eugene a letter telling him that the Fund would pledge one million dollars in certificates of deposit to secure the LIETA loan. When no LIETA money was forthcoming, Eugene and Charles applied to two banks in Mississippi, using the pension's

---

[3]Williams also was a business associate of Evans and Matthews.

[4]All of that really was moot because the State of Louisiana had yet to fill LIETA's coffers.

4

certificates of deposit as collateral.[5]  On the strength of the pledged collateral, the banks approved the loans.  Eugene used the bank loans for the purchase of the marble equipment and for operating expenses for his other ventures.

When his businesses failed, Eugene's loans went into default. The banks exercised their rights over the certificates of deposit against the Fund.  The pension fund lost the money represented by the certificates of deposit.

II.  Facts Pertinent to the Section 1014 Charges Against Williams

In the course of arranging the bank loans, Charles prepared three form resolutions, a standard component of a loan application. Eugene then presented these forms to Williams who signed them.  By signing both of the loan applications and, accordingly, attesting to the veracity of the information contained there, Williams allegedly made two statements that formed the basis for his convictions.  First, the forms listed him as the treasurer, secretary, and certifying officer of Southern Coffee.  Second, the resolutions stated that approval for the loans had been given at a meeting of the board of directors of Southern Coffee.

The government contended that Williams had never been elected to those positions or served in those capacities and, similarly, that the board of directors had not formally approved the resolution.  The jury agreed and convicted Williams of making false

_____

[5]The banks involved are the People's Bank of Biloxi and Merchant's Bank and Trust Company, Bay St. Louis.

statements to a federally insured bank.


### III.  Materiality Under Section 1014

It is illegal under 18 U.S.C. § 1014 to make a false, material statement to a federally insured banking institution.  To sustain a conviction under this statute, the government must prove that: (1) the defendant made a false statement to a financial institution; (2) the defendant knew the statement was false when he made it; (3) he made it for the purpose of influencing the financial institution's action; and (4) the statement was false as to a material fact.[6]

The defendant challenges that the statements were false, that he knew they were false, and that they were material.  He concedes that the statements were made to influence the bank's decision on Eugene and Charles's loan application.[7]  We need not address whether the statements were false or whether Williams knew of their falsity for we hold that the statements were not material.  As a result, the government failed to meet its burden and we must vacate Williams's convictions under § 1014.

Statutes imposing criminal penalties for making false statements long have required materiality as an essential element.[8]

---

[6]United States v. Thompson, 811 F.2d 841, 844 (5th Cir. 1987).

[7]Although Eugene and Charles applied to two banks for two distinct loans, we discuss these applications in the singular where the plural would require a cumbersome syntax.

[8]Sir Edward Coke wrote in 1680 that perjury is a crime committed by one who "sweareth absolutely, and falsely in a

Section 1014 is no exception: the government must prove that the false statement matters.

Statutes like section 1014 and section 1001 (the statute that makes it illegal to make a false statement to a government department or agency) are "highly penal" and, thus, require that the materiality element be taken seriously. In <u>United States v. Beer</u>[9], we emphasized that the severe penalties flowing from a conviction for making a false statement require the government to "make a reasonable showing of the potential effects of the statement".[10] In the present case, the government failed to do so.

Materiality is a legal determination made by the district court and, accordingly, is subject to complete review by this Court.[11] A challenge to the district court's finding of materiality is not a challenge to the sufficiency of the evidence even though it is a product of a factual evidentiary showing.[12] In other words, our review seeks to determine whether the district court's finding of materiality was erroneous as a matter of law.[13]

---

matter material to the issue." 3 E. Coke, Institutes 164 (6th ed. 1680). Otherwise, as Blackstone stated, "if it only be in some trifling collateral circumstance, to which no regard is paid, it is not penal." 4 W. Blackstone, Commentaries *137.

[9]518 F.2d 168 (5th Cir. 1975).

[10]<u>Id</u>. at 172.

[11]<u>United States v. Lueben</u>, 838 F.2d 751, 753 (5th Cir. 1988).

[12]<u>See</u> <u>Id</u>.

[13]<u>Id</u>.

7

A false statement is material if it is shown to be capable of influencing a decision of the institution to which it was made.[14] Moreover, the statements must be analyzed in the particular context in which they were made.[15]  In the context of the present matter, our inquiry is limited to whether the statements at issue -- the loan application forms listing Williams as secretary and treasurer and attesting that the board of directors formally approved the loan -- were capable of influencing the bank's decision to loan the Sykes brothers money.  We hold that these statements were not capable of influencing the bank's decision one way or the other and, as such, fail to meet the materiality requirement.

The United States urges that we adopt the broadest possible definition of materiality, relying on the Lueben case for the proposition: "[I]f these statements were immaterial, why were they required by the lending institution in each of the transactions?"[16] This dictum was intended as a rhetorical guidepost, not a bright line rule.  Otherwise, the law of materiality would change every time that a bank printed up a new loan application form.  We need not resort to these short-hand approaches, however, for the standard we are to apply is clear: If Williams's statements were capable of influencing the bank's decision, they are material.

---

[14]Id. at 754.  The statement need not actually influence a decision provided that it is capable of doing so.  Reliance is irrelevant.  United States v. Puente, 982 F.2d 156, 159 (5th Cir.), cert. denied, 113 S.Ct. 2934 (1993).

[15]Weinstock v. United States, 231 F.2d 699, 702 (D.C. Cir. 1956).

[16]Lueben, 838 F.2d at 755.

The government marshalled evidence showing that the banks would not have made the loans if they had known that these statements were false. In actuality, the bank officers merely testified that they would not have approved the loans if they had discovered that the applicant had lied. That does not make the lies themselves material, however. This is a crucial distinction. Aided by hindsight, the banks undoubtedly would not have made these loans. Any bank would be understandably reluctant to lend money to a corporation when its officers lie on the loan application. In sum, the government's evidence demonstrates only that the banks maintain a policy that warns against loaning money to entities which do not tell the truth; it is no way probative of the materiality of these particular statements.

Williams, in contrast, urges that we limit the parameters of materiality by looking to the purpose of the loan application. He argues that the fact that a board of directors meeting may not have taken place or that Williams was not actually secretary or treasurer did not matter to the bank in its evaluation of the loan application. He asserts instead that the only material fact elicited by the forms was that Charles, as sole director and shareholder of Southern Coffee, had authorized his brother Eugene to act for and bind the corporation when dealing with the banks. Williams presented evidence that the purpose of a corporate resolution in this context is to identify the person who has the power to bind the corporation. As to these loans, that person was primarily Eugene and, secondarily, Charles. Hence, Williams

9

argues, he was but an unnecessary (and immaterial) bystander.

We agree that an examination of the purpose of the loan forms is appropriate when defining the boundaries of materiality. The loan application includes standard forms used to verify the identity of those persons legally authorized to sign corporate checks and indorse instruments payable to the corporation. Moreover, the forms identify the persons capable of borrowing money from the bank in the corporations's name or of paying notes to the bank. The Executive Vice-Presidents of both the People's Bank and Merchant's Bank testified:

> That the purpose of the Corporate Resolution was to establish which persons had authority to legally bind Southern Coffee Company and which persons had authority to withdraw funds on behalf of Southern Coffee Company.[17]

The forms clearly identify those people as Eugene Sykes, the president, and C.T. (Charles) Sykes, the agent. In the light of this purpose, the fact that Williams was or was not secretary and treasurer or the question of whether the board met is of no consequence.

When we look to the purpose of the bank forms, we are asking whether reliance on the false statements would have changed the outcome. In the Beer case, for example, we held that the defendant's failure to include a loan to which he was accommodated on an FDIC form was immaterial.[18] We explained that one way of determining whether the statements were capable of influencing a

---

[17]Williams offered this same testimony at trial.

[18]Beer, 518 F.2d at 172.

10

bank's decision is to extrapolate from the facts and ask, "If the bank had relied on the defendant's statements, would it have made any difference?"  Similarly, the Weinstock court held that inaccurate information about the name of an organization on particular dates was not material for, if relied on, it would not have influenced any decision made by the agency to which it was directed.[19]

From that point of view, the cases upon which the government relies are distinguishable.  This is not a case like Lueben, where the defendant lied about his income to make his financial position look more attractive to the bank.[20]  Nor is it like Puente, where the defendant lied about his previous felony conviction in an effort to whitewash his past.[21]  In those circumstances, it is clear why a bank or federal institution, armed with the truth, would have arrived at a different decision on a pending application.

Section 1014 was not designed to convict on a technicality. More is required.  Williams merely signed the resolutions based upon the representations of Eugene and Charles.  Williams's signature reflected Charles's designation of a secretary and treasurer, if only for the purposes of procuring the loan money.[22]

---

[19]Weinstock, 231 F.2d at 702.  This framework should not be confused with our earlier statement that the legal determination of materiality is made without concern for whether the bank actually relied.

[20]Lueben, 838 F.2d at 754.

[21]Puente, 982 F.2d at 158-59.

[22]In fact, this assertion forms the basis of Williams's contention that the statements were not actually false.  Williams

11

The banks wanted to know who was responsible for these loans. Eugene and Charles were; Williams was not. We hold that Williams's statements were not material and, accordingly, we vacate his convictions under § 1014.[23]

IV.  The Conspiracy Count

Williams was charged under 18 U.S.C. § 371 with conspiracy to convert to one's own use securities of a pension fund.  Although the jury acquitted Williams of the substantive crime of embezzling pension funds, it convicted him of conspiracy.  Upon appeal, he charges that the evidence was not sufficient to sustain that verdict.

When a challenge is made to the sufficiency of the evidence

---

argues that as a sole shareholder and director, Charles could have had the meetings "in his head"; i.e., all activity that Charles took necessarily was the product of a "meeting" and necessarily had the unanimous support of the board of directors (of which Charles was the only member).  As Williams argues, when Charles turned in resolutions to the banks indicating that a meeting had taken place and that Williams was the secretary and treasurer, those assertions were -- by virtue of the fact that Charles said so -- true.  Similarly, Williams relies on Charles's statement that he did not intend to submit false documents; hence, as Williams argues, Charles must have believed that Williams was the secretary and treasurer.

The problem, however, came when Charles testified, in no uncertain terms, that no such meeting occurred and that Williams never was the secretary or treasurer of Southern Coffee. Although it may appear somewhat unfair for Charles now to say that these assertions were untrue, his is the only viable interpretation of what he meant and what actually occurred in a company where he was the sole shareholder and the sole director.

[23]As previously mentioned, in the light of our holding that the statements at issue are not material, we need not determine whether the statements were actually false or whether Williams knew they were false.

12

supporting a criminal conviction, the appellate court views the evidence in the light most favorable to the government, and with all reasonable inferences and credibility choices drawn in support of the jury's verdict.[24]  The question is whether a reasonable jury, as the final arbiter of the weight of the evidence, could find that the evidence establishes Williams's guilt beyond a reasonable doubt.

To sustain a conviction for conspiracy, the government had to prove that: (1) two or more persons agreed to commit a crime; (2) the defendant knew of the agreement and voluntarily became a part of it; and (3) at least one of the conspirators committed an act in furtherance for the conspiracy.[25]  Williams contends that the government failed to meet its burden with respect to the second prong.  He argues that the evidence is insufficient to show that he possessed the requisite knowledge of the conspiracy and voluntarily participated in it.

Although we will not conjecture as to what weight the jury accorded any particular piece of evidence, some evidence stands out for its probative worth.  For example, the government demonstrated that on at least two occasions discussions took place in Williams's

_____

[24]Glasser v. United States, 315 U.S. 60, 80, 86 L.Ed. 680 (1942); United States v. Kington, 875 F.2d 1091, 1100 (5th Cir.), reh'g denied, 878 F.2d 815 (1989).

[25]United States v. Frydenlund, 990 F.2d 822, 825 (5th Cir.), cert. denied, 114 S.Ct. 337 (1993); United States v. Chaney, 964 F.2d 437, 449 (5th Cir. 1992).  It is important to note that Williams himself need not have committed an overt act in furtherance of the conspiracy so long as one of his co-conspirators did.  Chaney, 964 F.2d at 449.

13

presence outlining the conspiracy to use the pension fund certificates as collateral for the loans. The pension fund certificates were identified specifically as Longshoreman Pension Fund CD's. In addition, the government properly introduced circumstantial evidence of guilt, including the defendant's presence at discussions and associations with the co-conspirators.[26]

The government cast doubt on Williams's contention that he never knew that the pension fund CD's were pledged as collateral for the loans. Williams maintained close business relationships with his co-defendants. He knew that Southern Coffee was in some financial trouble, for he had lent Eugene Sykes large sums of money to keep the company afloat. Williams knew that Eugene needed $435,000 to procure the marble cutting business (the purchase price of $460,000 less the $25,000 that Williams had lent him). Accordingly, Williams knew that Eugene would be going to Mississippi banks for that money. Similarly, the certificates were used to secure loans well in excess of the $460,000 that Williams knew was needed for the marble cutting venture. In fact, the loan from People's Bank alone amounted to $600,000, leaving an unexplained surplus.

Williams is a trained attorney and no stranger to the world of business. A reasonable jury could have concluded that Williams

---

[26]United States v. Magee, 821 F.2d 234, 239 (5th Cir. 1987). Note, however, that mere presence alone does not establish knowledge or participation. United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988), reh'g denied, 867 F.2d 1428 (1989).

14

understood the intent of his friends and, more, knew that Eugene had appropriated the pension funds's CD's to finance his various ventures.

Although Williams's false statements on the bank forms were not material, he was by no means an innocent bystander in the overall criminal scheme. While his co-defendants plotted the enterprise, Williams helped them achieve their aims. Williams did introduce some exculpatory testimony, but the jury apparently elected to accord it little credibility.[27] While no one piece of evidence may be patently sufficient, in the aggregate the quantum of evidence introduced was enough to allow a jury to reach a guilty verdict.[28] We affirm his conspiracy conviction.

## V. The Speedy Trial Act

The Speedy Trial Act ("the Act")[29] requires that a federal criminal defendant be tried within seventy days of his indictment or appearance in front of a judicial officer, whichever comes later.[30] If the defendant is not brought to trial within this statutory period, the indictment must be dismissed.[31] Williams charges that the district court erred in denying his motion to

---

[27]See United States v. Barksdale-Contreras, 972 F.2d 111, 114 (5th Cir. 1992), cert. denied, 113 S.Ct. 1060 (1993) (the jury is the final arbiter of credibility).

[28]See Id.

[29]18 U.S.C. § 3161, et seq.

[30]Id. § 3161(c)(1).

[31]Id. § 3162(a)(2).

15

dismiss which he based, in part, on an allegation that the court violated the Act's provisions.[32]

We will not belabor the Speedy Trial Act issue in the light of the detailed opinion entered by the district judge. The Act provides for a number of "exclusions" in which time that passes is not charged against the 70-day clock.[33] The district court added up the excludable time and concluded that fewer than 70 days had expired. We agree with that conclusion.

Williams first charges that the district judge improperly tolled the clock by granting continuances after two of the superseding indictments.[34] He also complains that the district judge granted continuances without articulating his reasons for doing so as mandated by § 3161(h)(8) of the Act. That section permits a judge to toll the clock if, in that judge's estimation, "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."[35] The Act reflects, in part, a belief that the boundaries of fairness

---

[32]The burden is, at all times, on the defendant to prove that such dismissal is appropriate. 18 U.S.C. § 3162(a)(2).

[33]Id. § 3161(h).

[34]When a superseding indictment is filed prior to the dismissal of the first indictment, as happened three times in the present matter, the original 70-day clock remains the appropriate measure. Id. § 3161(h)(6). The defendant devotes much space to this simple proposition which does not appear to be in dispute. Moreover, because the superseding indictments retained some of the original charges, motions pending on the original charges tolled the running of the clock for new charges in the superseding indictment.

[35]Id. § 3161(h)(8)(A).

16

affect not only the maximum time that a criminal defendant may be held without trial, but a minimum time prior to which it would be unfair to bring him to trial.[36]

The question presented, then, is whether these continuances were within the "ends of justice" and, further, whether the judge's failure to articulate reasons for the continuances constitutes reversible error. The court's reasons undoubtedly were those outlined by the government in its motion: the plea negotiations with the defendant had failed and the government had new evidence to submit in conjunction with a superseding indictment. The plea negotiations favored both sides; we cannot say upon review that justice was not served by granting a continuance after those negotiations broke down. We uphold the court's determination that the clock was properly tolled in these circumstances.

As for the judge's failure to articulate the bases for the continuances, we look to the two-fold purpose of the articulation requirement: It ensures first, that the trial court will carefully consider all relevant factors and, second, that a clear record will exist for appeal.[37] Although § 3161(h)(8)(A) requires an "ends of justice analysis" reflected in the record for every continuance granted, we explained in United States v. Eakes[38] that reversal is

---

[36]Id. § 3161(c)(2).

[37]United States v. Rush, 738 F.2d 497, 507 (1st Cir. 1984), cert. denied, 470 U.S. 1004 (1985). Although the reasons for an "ends of justice" continuance must be articulated, they need not be articulated at the time the continuance is granted. Id.

[38]783 F.2d 499 (5th Cir.), cert. denied, 477 U.S. 906 (1986).

17

not in order when the reasons for a continuance are patent.

> We decline to apply a hypertechnical construction to the language of the Act in this case where the judge clearly granted the continuance for the benefit of and at the indirect request of the defendant who complains of that grant.[39]

In the case at hand, the district court's reasons for granting the continuance are clear and justified. Accordingly, we will not reverse because the court failed to articulate its reasons. Although we uphold the district court's determination, we encourage any court confronting this issue to err on the side of caution and explain for the record how the continuance serves the ends of justice.

Williams next complains that the district court erred when it determined that the defendant had motions outstanding after March 4, 1992. The Act excludes from calculation the period that runs from the time when pretrial motions start pending until the court resolves them.[40] A motion under advisement is excludable up to thirty days.[41] If the court has several motions on which it must rule, however, this time period can be reasonably extended.[42] Similarly, the time between the filing of a motion and the hearing on that motion is to be excluded, even if the time lapse was not

---

[39]Id. at 504.

[40]18 U.S.C. § 3161(h)(1)(f).

[41]Id. § 3161(h)(1)(J).

[42]United States v. Tibboel, 753 F.2d 608, 612 (7th Cir. 1984).

18

reasonable.[43]

Specifically, Williams argues that the period running from March 4, 1992, to July 28, 1992 (146 days in all) should be counted against the clock. The former date, he argues, marks the last day on which he still had a motion pending (his motion for severance, which ultimately was denied). The latter date marks the next time he filed a motion, once again tolling the clock. The district court, however, specifically rejected this argument. The court stated, unlike the characterization Williams would give, that Williams still had a number of pretrial motions pending and undecided at the time the motion for severance was denied.[44] We will not disturb the district court's explicit conclusion that those motions remained unresolved beyond the disposition of the defendant's motion to sever, in the absence of some indication to the contrary.

Although the superseding indictments and multiple defendants in this case complicate a Speedy Trial Act analysis, we hold that the district court's conclusion was correct; fewer than 70 non-excludable days ticked off the Speedy Trial clock.

----

[43]Henderson v. United States, 476 U.S. 321, 329-30, 90 L.Ed.2d 299, 308 (1986).

[44]By the district court's calculations, March 4 really had no significance, for, although the central motion to sever had been resolved, the other outstanding motions continued to toll the clock. See United States v. McCusker, 936 F.2d 781, 783 (5th Cir. 1991). The origins of the dispute are clear: the judge who oversaw Williams's motion to sever gave conflicting indications regarding the finality of his judgment on all outstanding motions.

## VI.  Conclusion

For the foregoing reasons, we AFFIRM Williams's conviction for conspiracy under 18 U.S.C. § 371; we VACATE his convictions 18 U.S.C. § 1014; and we REMAND this matter to the district court for re-sentencing in the light of this result.