UNITED STATES of America, Plaintiff,

v.

DAEWOO INTERNATIONAL (AMER-ICA) CORPORATION and Daewoo Corporation, Defendants.

Court No. 87–03–00528.

United States Court of International Trade.

Sept. 29, 1988.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (A. David Lafer and Jeanne E. Davidson), Washington, D.C., of counsel, Robyn M. Bacon, Los Angeles, Cal., Charles D. Ressin, Sandra Strempel and Kathleen F. McGuigan, U.S. Customs Service, Washington, D.C., for plaintiff.

Milbank, Tweed, Hadley & McCloy (Richard D. Cleary, Edward J. Reilly, New York City, and Stanley J. Marcuss), Washington, D.C., for defendants.

## MEMORANDUM OPINION

TSOUCALAS, Judge:

The government alleges defendants fraudulently imported 236 entries of steel and steel products into the United States in violation of 19 U.S.C. § 1592 and seeks to recover $163,065,386.00 assessed in penalties. Plaintiff has moved for partial judgment on the pleadings pursuant to USCIT R. 12(c) claiming defendants are estopped from denying their liability as to nine of the entries because they had previously pleaded guilty in a criminal action which involved these nine entries.

Defendants oppose plaintiff's motion for partial judgment on the pleadings arguing the Court should not give collateral estoppel effect to the guilty pleas because: (1) no issues were actually litigated in that proceeding; (2) there is a lack of identity in issues between the criminal violations and the civil violations of 19 U.S.C. § 1592; (3) 19 U.S.C. § 1592 requires a full evidentiary hearing; and (4) defendants' affirmative defenses bar plaintiff's recovery. Plaintiff has moved to strike defendants' affirmative defenses and to strike an affidavit of a former Customs' official submitted by defendants in support of their affirmative defenses.

## Background

On January 3, 1985, defendants Daewoo International Corporation (Daewoo–America), Daewoo Corporation (Daewoo–Korea), and the president of Daewoo–Korea pleaded guilty to Counts One through Ten of a Superseding Information. *See Plaintiff's Memorandum in Support of its Motion for Partial Judgment on the Pleadings,* Attachments B, C (hereinafter *"Plaintiff's Memorandum"*). In the Information, defendants were charged with knowingly, willfully and unlawfully making and causing to be made material false and fraudulent statements and representations to the United States Customs Service (Customs) and the United States Department of Commerce (Commerce). *Plaintiff's Memorandum,* Attachment B. These statements were made on consumption entries including Special Summary Steel Invoices (SSSI) in connection with the importation of steel in violation of 18 U.S.C. § 1001 (covering false statements) and other Federal Criminal Statutes. In substance, defendants sought to avoid the Trigger Price Mechanism (TPM), which was a means to monitor dumping: if steel was sold below the trigger price, an antidumping duty investigation could be initiated. Defendants submitted false declarations to Customs whereby the sales prices were falsely inflated. A criminal investigation resulted in a 32 Count Grand Jury Indictment against Daewoo–America, Daewoo–Korea, and other individuals. *See Plaintiff's Memorandum,* Attachment A.

Count One of the Information alleged the factual elements of the conspiracy to fraudulently enter steel products:

A. INTRODUCTORY ALLEGATIONS:

. . . .

6. At all times relevant to this information, importers of various steel products were required, at or near the time of importation, to submit consumption entry documents to the United States Customs Service concerning the importation, including, but not limited to: Consumption

Entry forms (Form No. 7501); Special Summary Steel Invoices (Form No. 5220); Commercial Invoices; and Special Customs Invoices (Form No. 5515).

7. At all times relevant to this information, consumption entry documents filed with the United States Customs Service in connection with an entry of merchandise were required to set forth truthful information concerning the price of the merchandise, including a statement as to whether a rebate has been allowed upon exportation of the merchandise from the foreign country into the United States. Title 19, United States Code, Sections 1481(a) and 1485(a).

8. At all times relevant to this information, the Antidumping Act, Title 19, United States Code, Section 160 *et seq.*, as amended, 19 U.S.C. 1673–1677, provided for the imposition of additional duties, known as dumping duties, if the Government determined that foreign merchandise was being imported into the United States at less than its fair value and that this conduct was injuring an industry of the United States.

9. In an effort to detect possible dumping of foreign steel products and to enforce the provisions of the Antidumping Act, on or about December 30, 1977, the United States Treasury Department announced a program to monitor the prices of steel mill products imported into the United States, which monitoring device was called the Trigger Price Mechanism (TPM). Under the TPM program, administered at various times by the United States Treasury and Commerce Departments, if various steel products imported into this country were sold below a specific price, known as the "trigger price," an anti-dumping investigation could be instituted by the United States. Trigger prices for steel were published by the Department of the Treasury during the period February 1978 to January 11, 1982, with the exception of a six-month period in 1980.

## B. OBJECT OF THE CONSPIRACY

10. From on or about January 1980 and continuing to or about June of 1982 in the Central District of California and elsewhere, the defendants DAEWOO–KOREA and DAEWOO–AMERICA, knowingly, willfully and unlawfully conspired, combined, confederated and agreed together to commit an offense against the United States; that is, to knowingly, willfully and unlawfully make and cause to be made to the United States Customs Service and the United States Department of Commerce material false and fraudulent statements and representations in connection with the importation of steel products referred to in those consumption entries identified in counts two through ten below in violation of 18 U.S.C. 1001.

## C. MEANS OF THE CONSPIRACY

In order to further the objects of the conspiracy as set forth in paragraph 10 and to conceal the true prices of these steel product transactions and avoid and evade the proper application of the Trigger Price Mechanism and avoid possible anti-dumping investigations, the defendants DAEWOO–KOREA and DAEWOO–AMERICA would and did cause falsely inflated sale prices to its American customers to be reported to the United States Customs Service with respect to those consumption entries referred to in counts two through ten, below, and further with respect to those consumption entries:

(1) It was a part of the conspiracy that in order to disguise the actual price of the imported steel products DAEWOO–AMERICA would issue falsely inflated invoices to its unrelated resale customers, and that these inflated invoices would coincide with the falsely inflated prices submitted to the Customs Service;

(2) It was a part of the conspiracy that, even at the time of the entry of the steel and at the time of the issuance of the inflated invoices, DAEWOO–AMERICA would expect its American resale customers to pay only the actual agreed purchase order prices rather than the falsely inflated invoice prices; and

(3) It was a part of the conspiracy that DAEWOO–AMERICA would keep internal records of the difference between the

false invoice prices and the actual agreed purchase order prices and would prepare internal credit memoranda to credit customers' accounts for "trigger price difference" amounts.

*Plaintiff's Memorandum*, Attachment B at 1–5.

Counts Two through Ten describe the individual occurrences in which defendants "did knowingly, willfully and unlawfully make and cause to be made a material false and fraudulent statement and representation on a Special Summary Steel Invoice (Form 5520) ... (In violation of 18 U.S.C. 1001 and 2)." *Id.* at 6.

### Discussion

■] Plaintiff has moved for partial judgment on the pleadings in connection with the nine entries subject to defendants' guilty pleas. Plaintiff's motion for judgment on the pleadings must be denied if, as against the defendants, any factual issue is raised, but granted if there is no factual dispute and plaintiff is clearly entitled to judgment as a matter of law. *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 68 Cust.Ct. 377, 379, C.R.D. 72–11, 343 F.Supp. 1387, 1390 (1972). It must appear to a certainty that defendants are not entitled to judgment under any facts that may be proved, viewing the pleaded facts most favorably toward defendants, and drawing all reasonable inferences thereto. *Id.; F.W. Myers & Co. v. United States,* 72 Cust.Ct. 133, 135, C.D. 4515, 374 F.Supp. 1395, 1397 (1974). Plaintiff maintains defendants are collaterally estopped from denying liability under § 1592, since defendants' guilty pleas to § 1001 establish the elements of the offense under § 1592.[1]

■] The basic concept behind collateral estoppel is to preclude relitigation of an issue. Thus, issue preclusion may be invoked where a subsequent action involves the same issue of fact or law which was actually litigated and determined in the first action, where that determination was essential to the previous judgment, and where a full and fair opportunity to litigate the issue was afforded. *See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *also Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971); *Cromwell v. County of Sac,* 94 U.S. 351, 353, 24 L.Ed. 195 (1877); *Jackson Jordan, Inc. v. Plasser American Corp.,* 747 F.2d 1567, 1575–76 (Fed.Cir.1984) (citing Restatement (Second) of Judgments § 13 (1982)).

■] Generally, a prior criminal conviction can be used by the government to estop a defendant from denying civil liability in a subsequent proceeding. *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1951). It has been held that collateral estoppel applies whether the prior criminal proceeding was adjudicated by jury verdict or by guilty plea. *Brazzell v. Adams,* 493 F.2d 489, 490 (5th Cir.1974).

■] According to defendants, relying on *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct.

---

1. Section 1001 of title 18 provides:
 § 1001. Statements or entries generally
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 The relevant provisions of 19 U.S.C. § 1592 set forth:
 § 1592. Penalties for fraud, gross negligence, and negligence

 (a) Prohibition
 (1) General rule
 Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence—
 (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—
 (i) any document, written or oral statement, or act which is material and false, or
 (ii) any omission which is material, or
 (B) may aid or abet any other person to violate subparagraph (A).

2368, 76 L.Ed.2d 595 (1983), a plea of guilty means that no issue was actually litigated, therefore, the conviction should not be given collateral estoppel effect. The Supreme Court held that Prosise, after pleading guilty in a prior criminal action, was not collaterally estopped from bringing a § 1983 action against police officers for allegedly violating his Fourth Amendment rights by conducting an unlawful search which gave rise to his arrest. Defendants seize certain language used by the Court, specifically, that "no issue was 'actually litigated,'" *id.* 462 U.S. at 316, 103 S.Ct. at 2374, in the previous criminal action as support for their argument. However, this observation must not be taken out of context. The primary focus of the Court's analysis was on the specific issue sought to be precluded, the legality of the search, which was not litigated and not determined by defendant's plea of guilty, nor was it essential to the judge accepting that plea.[2] *Id.*

Had the Supreme Court desired the result in *Prosise* to signify that a defendant's guilty plea can never be used to estop him from denying liability in a subsequent civil suit, surely its analysis could have ended with the "actually litigated" question. It did not. Instead, the Court's analysis reached each requirement of the collateral estoppel doctrine, including observing that the only issue raised and *determined* by Prosise's guilty plea was that he committed the substantive offense. *Cf. Otherson v. Dep't of Justice, INS,* 711 F.2d 267, 275 n. 8, 277 n. 11 (D.C.Cir.1983) (where the court recognized that the *Prosise* decision did not finally settle the question and that facts established by a guilty plea may be preclusively established at later civil trials). Therefore, the *Prosise* decision cannot serve, by itself, as a basis for denying the estoppel effect for issues admitted in guilty pleas.

Moreover, subsequent to *Prosise*, other courts have recognized that a guilty plea in a criminal action will establish, for purposes of the subsequent civil proceeding,

the facts alleged in the complaint upon which defendant was convicted. *Appley v. West,* 832 F.2d 1021, 1025–26 (7th Cir.1987) (citing *Nathan v. Tenna Corp.,* 560 F.2d 761, 763 (7th Cir.1977)); *Brown v. Green,* 738 F.2d 202, 206 (7th Cir.1984); *see also Battieste v. City of Baton Rouge,* 732 F.2d 439, 441 (5th Cir.1984) (to the extent that collateral estoppel applies, it may be asserted as an affirmative defense in § 1983 action, citing *Prosise,* 462 U.S. 306, 103 S.Ct. 2368). It is worth noting that Fed.R. Crim.P. 11(f) requires a court to make "such inquiry as shall satisfy it that there is a factual basis for the plea" before the plea may be accepted.

■ Consequently, to the extent the facts admitted by defendants in their guilty pleas satisfy the elements of a fraudulent violation of § 1592, defendants may be collaterally estopped from denying liability under § 1592. Defendants claim there is a lack of identity of issues since the elements of § 1001 and § 1592 differ in three respects: (1) the standard of materiality; (2) the standard of intent; and (3) the "entered by means of" requirement.

■ Defendants maintain that the Information to which they pleaded guilty did not establish the materiality of the statements referred to therein for purposes of § 1592 because there is no allegation that the statements had any impact upon a decision made by *Customs.* The Information charges that defendants sought to evade the TPM which would affect a decision by *Commerce* as to whether an antidumping duty investigation should be initiated. Under § 1001, courts have interpreted a material false statement to be "one that is *capable* of affecting or influencing the exercise of a government function." *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir.1980), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980) (emphasis in original) (citations omitted); *United States v. Valdez,* 594 F.2d 725, 728 (9th Cir.1979). There need not be any pecuniary loss involved but merely a potential impairment of a government agency's func-

---

**2.** The Court specifically stated "a determination that the search of Prosise's apartment was illegal would have been entirely irrelevant in the context of the guilty plea proceeding." *Id.*

tioning. 610 F.2d at 1278 (citations omitted).

This Court has adopted a similar definition of materiality in the context of § 1592 proceedings, "the test is whether [the false statement] has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made." *United States v. Rockwell Int'l Corp.*, 10 CIT ——, ——, 628 F.Supp. 206, 210 (1986). Customs itself has defined materiality within the scope of § 1592 by stating: "[a] document, statement, act, or omission is material if it has the potential to alter the classification, appraisement, or admissibility of merchandise, or the liability for duty, or if it tends to conceal an unfair trade practice under the antidumping" duty statute. 19 C.F.R. Part 171, App. B(A) (1984). In *Rockwell,* where components were actually of foreign origin but identified to be domestic, the court held "that the measurement of the materiality of the false statement is its potential impact upon Customs determination of the correct duty for the imported merchandise." 10 CIT at ——, 628 F.Supp. at 210. The falsity was material irrespective of whether the United States might be deprived of any lawful duty (if defendant had overestimated duties of a separate component). *Id.*

Defendants claim Customs merely collects the data from SSSIs and makes no substantive decision which could have been potentially affected by these statements. Accordingly, since the Information did not charge that the false statements influenced the assessment of duties, or the conditions of entry, and since it only alleged defendants sought to avoid a potential antidumping investigation but not antidumping duties, it cannot be material. The Court disagrees. The statements involved here were material. It is irrelevant that the United States may not be deprived of any lawful duties because defendants overstated the value of the merchandise. *See id.* Initially, the question of materiality is one of law. *Id.* at ——, 628 F.Supp. at 209–10. Therefore, the Court must evaluate the facts in the Information to which defendants pleaded guilty to determine whether they satisfy the materiality standard under § 1592. Defendants admitted that their knowingly, willful false statements made to Customs and Commerce were to avoid the TPM and a possible antidumping investigation. It is beyond peradventure that Customs' responsibility in gathering accurate information from the SSSIs was a key component in effective implementation of the TPM. The Court is of the opinion that in the context of a remedial statute such as § 1592, as distinct from a criminal statute where a narrow construction of terms may be warranted, actions taken to avoid a possible antidumping *investigation* necessarily seek to avoid the imposition of possible antidumping duties.

While defendants are correct in that not every false statement submitted to Customs will support a violation under § 1592, *United States v. Rose,* 570 F.2d 1358, 1363 (9th Cir.1978), the statements here were so intertwined with Customs responsibility in the import process that they are material. The value of the steel in the SSSIs is the basis upon which Customs compares the trigger price. Even though Commerce decides the appropriateness of initiating an antidumping investigation, it cannot be gainsaid that the anlaysis performed by Customs in reliance on information by the importer is the crux of Commerce's subsequent decision. The importance of accurate collection of import data is not only relevant to proper implementation of the TPM but also mandated by statute. *See* 19 U.S.C. § 1481(a). "[T]he purpose of section 1592 was 'to encourage accurate completion of the entry documents upon which Customs must rely to assess duties and administer other customs laws.'" *United States v. F.A.G. Bearings, Ltd.,* 8 CIT 294, 296, 598 F.Supp. 401, 403–04 (1984) (citing S.Rep. No. 778, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2211, 2229). Contrary to defendants' assertions, the Information need not mention these statutes for the Court to find that the *facts* outlined in the Information, which the defendants admitted, establish violations of Customs law.

■ Defendants next claim that fraudulent intent under § 1001 and § 1592 differ. The standard for a fraudulent violation under § 1592 is set forth in the Customs regulations:

> A violation is determined to be fraudulent if it results from an act or acts (of commission or omission) deliberately done with intent to defraud the revenue or to otherwise violate the laws of the United States, as established by clear and convincing evidence.

19 C.F.R. Part 171, Appendix B(B)(3). Defendants argue that the guilty pleas do not establish that they intended to defraud the revenue or that they violated any law of the United States.

Defendants rely on *Lichenstein* for the definition of fraud under § 1001: "[t]he statement must have been made with an intent to deceive, a design to induce belief in the falsity or to mislead, but § 1001 does not require an intent to defraud—that is, the intent to deprive someone of something by means of deceit." 610 F.2d at 1276–77. Accordingly, defendants conclude that their guilty pleas do not establish fraud because under § 1001 there is no requirement of an intent to defraud as is present in § 1592, and defendants did not intend to violate any law because the TPM is not a law, but a policy.

The Court accepts defendants' first premise that the requisite *mens rea* for a violation under § 1001 may not prove fraud for purposes of § 1592 with reference to the intent to defraud. However, defendants admitted that they "did knowingly, willfully, and unlawfully make and cause to be made a material false and fraudulent statement and representation on a [SSSI] (Form 5520)" with respect to each of the nine entries. *Plaintiff's Memorandum,* Attachment B at 6. This is the specific factual allegation to which defendants entered their guilty pleas. By admitting to this practice, the requisite fraudulent intent, *i.e.*, to violate the laws of the United States has been established. The TPM may have only been a policy designed to implement the antidumping laws, however, the Court has previously described how defendants' actions sought to avoid proper application of the dumping statute.

■ Defendants further claim that, under § 1592, the merchandise must be entered "by means of" the material false statement and this was not previously established by their guilty pleas because this requirement is not an element of § 1001. It is argued that the government's failure to prosecute defendants under 18 U.S.C. § 542, the criminal counterpart of 19 U.S.C. § 1592, clearly demonstrates that the government could not sustain a conviction under § 542, and thus cannot prove a violation under § 1592.[3] Defendants' argument was recently rejected in *United States v. Walter C. Loesche,* 12 CIT ——, 688 F.Supp. 649 (1988), wherein the court held:

> [T]he Government's choice initially to prosecute defendants under 18 U.S.C. § 1001, rather than under the special customs fraud provision of 18 U.S.C. § 542 is not relevant to the issues now before this court, because neither criminal statute can operate to preclude this civil action. The right to recover civil damages, in addition to the right of criminal recourse, is vested with the Government, and no special authorization to that effect need be contained in the criminal statute.
>
> . . . .
>
> The Court grants the Government's motion for partial summary judgment and is not persuaded that there exists

---

3. 18 U.S.C. § 542 provides:

§ 542. Entry of goods by means of false statements

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or bymeans of any false statement, written or verbal, or by means of any false or fraudulent practice, or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties;

any material issue of facts which have to be tried.

*Id.* at —, 688 F.Supp. at 651.

While the Court considers this case to be dispositive of the instant issue, a brief discussion of *United States v. Teraoka,* 669 F.2d 577 (9th Cir.1982) is merited, as defendants have relied heavily on that decision to support their argument. *Teraoka* involved a fraudulent scheme, practically mirroring that presented herein, where the TPM was sought to be avoided by fraudulent inflation of the purchase price. The court construed the "by means of" language in § 542 to encompass only those false statements bearing significance to the actual importation and admission of the goods. *Id.* at 579 n. 3. *Teraoka* held that the incorrect invoice prices did not operate to deny the goods entry or affect the "terms upon which entrance is granted ... [t]he TPM then has no effect whatsoever on importation." *Id.* at 579.

However, *Teraoka* has not been well received by this, or other courts construing § 1592. To the extent *Teraoka* implies that an entry is only accomplished "by means of" a false document where the entry would otherwise be restricted or prohibited, the courts have refused to engraft such a requirement on § 1592. *United States v. Ven–Fuel, Inc.,* 758 F.2d 741 (1st Cir.1985); *United States v. F.A.G. Bearings Corp.,* 8 CIT 201, 615 F.Supp. 562 (1984); *United States v. F.A.G. Bearings, Ltd.,* 8 CIT 294, 598 F.Supp. 401 (1984). Application of *Teraoka* would emasculate the essential civil enforcement statute of § 1592. *F.A.G. Corp.,* 8 CIT at 209, 615 F.Supp. at 569; *Ven–Fuel,* 758 F.2d at 762. The bounds of § 1592 reach to false statements and practices in relation to lawfully imported merchandise. *See id.* The "by means of" false statement criteria has been satisfied where the false statement referred to *value,* origin, quantity, and price made in connection with the entry process. *F.A.G. Corp.,* 8 CIT at 209, 615 F.Supp. at 569. Thus, the "by means of" criterion has been satisfied.

■ Finally, defendants contend that § 1592 requires a trial *de novo,* which de-

fendants would be denied if collateral estoppel applies. However, this requirement merely references the applicable standard of review, which means the Court finds the facts as opposed to referring to those on the agency record. If the Court determines the facts, as admitted in the guilty plea, satisfy the elements of § 1592 the Court has not abrogated its fact finding function. *See Otherson,* 711 F.2d at 272–73 (collateral estoppel invoked in subsequent civil action notwithstanding that adverse party would have been entitled to a hearing).

Defendants were represented by counsel in the previous criminal proceeding which involved serious significant charges. The Court finds defendants would have had ample incentive to litigate these issues previously. No inequity in applying collateral estoppel is manifest and defendants have not offered any compelling equitable or factual circumstances to indicate otherwise. A copy of the plea agreement indicates that counsel negotiated the plea on the basis of the corporate defendants wherein defendants agreed to admit to the factual allegations underlying the criminal violations.

Defendants also maintain that their affirmative defenses bar judgment for plaintiff. Defendants' second, third, and fourth defenses relate to the question of materiality and the "by means of" language in § 1592. As the Court has previously addressed these contentions, no further discussion is warranted and the conclusion thus mandated is that they fail in their attempt to defeat recovery for plaintiff.

Defendants' first defense asserts that this action is barred by the statute of limitations. Defendants' fifth defense alleges that the government precluded defendants' opportunity for fair and impartial mitigation proceedings which should prevent plaintiff from recovery.

Plaintiff has moved to strike these defenses as insufficient. The untimely filing of this motion is in issue, since USCIT R. 12(f) imposes a 20–day time limit after service of the answer to file such a motion and plaintiff's motion was brought after the 20–day limit. However, a motion to strike

may be considered even though submitted beyond the 20–day period.

In the case of a challenge to the sufficiency of a defense, whether it is advanced in a timely or untimely pre-answer motion under rule 12(f) ... or is made in a simultaneous motion to strike, probably is of little practical importance. That is because Rule 12(h)(2) permits an "objection of failure to state a legal defense" to be asserted "by motion for judgment on the pleadings, or at the trial on the merits," which provides a method for attack even if the time for moving to strike under Rule 12(f) has expired.

5 Wright & Miller Federal Practice & Procedure § 1380, at 786 (1969 & Supp.1987). The Court will, therefore, consider plaintiff's motion to strike.

▮ Broad discretion is granted to the Court in determining whether to grant a motion to strike. *Beker Industries Corp. v. United States,* 7 CIT 199, 200, 585 F.Supp. 663, 665 (1984). These motions are not generally favored by the courts because they are a drastic remedy. *Id.*

▮ In regard to the first affirmative defense asserted by defendants, the investigation giving rise to this civil action was suspended pending resolution of the criminal case. However, the time limit for commencing this action was not tolled by that suspension. Correspondingly, defendants executed voluntary waivers of the statute of limitations as the parties preferred that a resolution be reached on the administrative rather than judicial level. On March 8, 1985, defendants' counsel executed waivers of the statute of limitations for a period of one year from that date. The substance of that document indicates:

This waiver is made knowingly and voluntarily by Daewoo International (America) Corporation [and Daewoo Industrial Company, Ltd. (Daewoo Corporation)] in order that said party might obtain the benefits of the orderly continuation of administrative proceedings currently being conducted by the United States Customs Service.

*Plaintiff's Memorandum in Support of its Motion to Strike,* Collective Exhibit A.

Identical waivers executed on December 6, 1985 extended the period through March 7, 1987. *Id.*

Settlement negotiations between the parties proceeded from the latter part of 1985 through early 1986. Negotiating on behalf of defendants were defendants' attorney James Lundquist, and former presidential assistant, Michael K. Deaver, retained as consultant. *See also* Affidavit of James H. Lundquist at 2. The amount of the penalty issued against defendants then was $34.5 million.

After several offers were refused, in April 1986, a proposed settlement in the amount of $12 million was prepared, which was initialed by defendants' counsel and an attorney advisor from the Customs Service. *Id.* at 5; *see also Affidavits of Alfred R. DeAngelus, James H. Lundquist and Dae–Soo Lee Submitted in Opposition to Plaintiff's Motions to Strike Defendants' First, Fourth and Fifth Defenses,* Exhibit C (hereinafter *"Affidavits in Opposition "*). Immediately thereafter, a formal settlement offer by defendants was submitted to the Assistant Secretary of the Treasury for Enforcement, the official authorized to accept such offers. *Id.,* Exhibit D. Concurrently, defendants tendered a check for $2 million and a promissory note for the remainder in accordance with 19 C.F.R. § 161.5. *Id.*

However, the settlement agreement was never executed on behalf of the government. During the period after the settlement offer was prepared, the lobbying activities of Michael Deaver came under scrutiny by the House Energy and Commerce Committee, chaired by Representative John Dingell. Subsequently, the $12 million settlement agreement was rejected and the check was returned. A letter, dated June 2, 1985, by Alfred R. DeAngelus, Deputy Commissioner of Customs, responded to defendants' offer:

As you know, there is a risk for the Government, and the alleged violator, in entering into settlement negotiations while a section 1592 investigation is ongoing. For the Government, the earlier a settlement agreement is reached, the

greater the likelihood that the alleged violator will escape any increased liability because of the possible discovery of additional violations. For the alleged violator, the later a settlement agreement is reached, the greater the likelihood that the alleged violator will incur increased liability because of the possible discovery of additional violations.

Customs rejection of your previous $11 million offer, and your pending offer of $12 million was based upon known violations and potential violations. The $12 million figure was raised by you during the first part of February, 1986. On February 28, 1986, additional violations became known to us. The $12 million offer was not executed and submitted until April 4, 1986. Therefore, we firmly believe that these subsequently discovered violations must be considered in arriving at a fair and equitable settlement for the Government.

*Affidavits in Opposition,* Exhibit I.

 Thus, although it is alleged that Customs discovered more violations which would justify refusing the offer, defendants claim the real reason Customs rejected the settlement was the threat of congressional hearings on the propriety of any agreement where Michael Deaver had intervened. As this relates to the statute of limitations defense, defendants assert that the waivers implied the government would negotiate in good faith, but by repudiating the agreement because of improper congressional influence, the government acted in bad faith and, therefore, the waivers were null and void. In support of their allegations, defendants have submitted an affidavit from Alfred DeAngelus, which plaintiff has moved to strike.

It is the waiver itself which must be analyzed to determine whether it is enforceable. These documents were not conditioned upon a settlement being reached. The waivers iterate their purpose: to "obtain the orderly continuation of administrative proceedings currently being conducted by the Customs Service." *Plaintiff's Motion to Strike and Reply in Support of its Motion for Partial Judgment on the*

*Pleadings,* Collective Ex. A. Had defendants not executed these waivers, the government would have been within its rights to commence this action at an earlier date, before the expiration of the statute of limitations. There is no legal obligation on the part of the government to settle the case. 19 U.S.C. § 1617 (1982) authorizes the Secretary of the Treasury to compromise claims under certain situations. 19 C.F.R. § 161.5, the implementing regulation, requires that the deposit be tendered with the offer and contemplates return of the money if the offer is rejected. It was clearly a voluntary action by both parties to enter into negotiation, with no assurance of the outcome. Therefore, the Court will not focus on why the settlement was not accepted or whether Customs refusal to accept the offer was due to Congressman Dingell's investigation. *See Montgomery Ward & Co. v. Zenith Radio Corp.,* 69 CCPA 96, 673 F.2d 1254 (1982), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed. 2d 200 (1982) (settlement agreement not within scope of judicial review except to the extent that procedural violations of § 1617 are subject to judicial review). The Court is concerned only with the knowing, voluntariness of the waiver which is not disputed, and which was executed by corporate defendants' counsel with defendants' authorization. Therefore, the statute of limitations defense is not sufficient as a matter of law.

Defendants additionally claim that they were denied fair and impartial mitigation proceedings as a result of this improper influence. As plaintiff submits, the only administrative proceedings mandated by § 1592 is the mitigation process outlined in 19 U.S.C. § 1618 (1982 & Supp. IV 1986). Discretion rests with the Secretary of the Treasury as to whether mitigation of penalties is warranted. Once the settlement negotiations were aborted, Customs ultimately issued penalty notices totalling approximately $162 million. Defendants pursued their administrative remedies by filing petitions for mitigation. Customs and Treasury did mitigate the penalty to $110 million, which represented 80% of the dutiable value of the merchandise. Defendants al-

lege that the mitigation process was tainted by the prior political interference exerted by congressional pressure, thus, the mitigation decision was not based on the merits of their petition. Defendants contend that the $110 million mitigated penalty in comparison to the $12 million figure, which was previously deemed by Customs officials a satisfactory compromise of defendants' liability, is evidence of the improper influence exerted on Customs.

 While it is abundantly clear that the mental process of the Secretary may not be probed to ascertain motives, the Secretary's exercise of its discretion is not boundless. *Montgomery Ward,* 69 CCPA at 109, 673 F.2d at 1263 (citing *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)). Rather, the Court is empowered to review whether procedural irregularity violative of statutory or regulatory requirements, or as a result of impermissible influence, occasioned the agency's decision. *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574 (3d Cir.1979). If congressional pressure, even in part, forms the basis for the Secretary's decision, it is invalid, since the Secretary's decision must be based solely on those criteria statutorily outlined in the statute. *Sierra Club v. Costle,* 657 F.2d 298, 408–09 (D.C.Cir.1981). Political pressure exercised by a member of Congress may compromise the appearance of impartiality. *Koniag, Inc., the Village of Uyak v. Andrus,* 580 F.2d 601, 610 (D.C.Cir. 1978), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978). However, the mitigated amount representing 80% of the claim is not *per se* conclusive of undue influence. *See* 19 C.F.R. Part 171, App. B(D)(2)(b) (for fraudulent non-revenue loss violations penalty shall be mitigated from 50–80% of dutiable value).

 The Court does not find it necessary to strike this defense or the DeAngelus affidavit. While defendants presume that an alleged impartial mitigation process should result in dismissing the § 1592 action to collect the assessed penalties, the Court does not concur. In the Court's view, these issues go to the amount of mitigation of any such penalty. The allegations addressing the impartiality of the mitigation process do not attack the underlying violation. Since the amount of any penalty to be assessed shall be determined by the Court, whether at trial or otherwise, the concerns relating to the mitigation procedure may be voiced at that time. However, to reiterate, this defense does not preclude granting partial judgment on the pleadings for plaintiff.

## Conclusion

Plaintiff's motion for partial judgment on the pleadings as to the nine entries is granted since as a matter of law, defendants' guilty pleas in the prior criminal action have established all the elements of a violation of § 1592 as to these entries. Defendants' affirmative defenses do not defeat that judgment. The statute of limitations defense is not sufficient as defendants executed a waiver of the statute of limitations which did not obligate Customs to settle the case. These waivers were not rendered null and void because Customs would not execute the settlement agreement. The waivers were conditioned upon the orderly continuation of the administrative process, but clearly Customs was never compelled to accept any settlement offer. Defendants' affirmative defense which asserts that improper congressional pressure tainted the mitigation process does not invalidate the fact that a violation of § 1592 has been established. Instead, it is properly directed at the amount of penalty to be assessed. As the Court will untimately determine that issue, there is no need to strike that defense or the DeAngelus affidavit submitted in support thereof.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that plaintiff's motion for partial judgment on the pleadings is granted; and it is further

**1546**

ORDERED, ADJUDGED, and DE-CREED: that partial judgment be, and hereby is, entered in favor of plaintiff against defendants in the amount of $213,-878.00, together with interest as applicable by law, covering the following nine entries in which defendants had pleaded guilty in a prior criminal action:

| | |
|---|---|
| 82–414398–1 | $ 7,314.00 |
| 82–414401–6 | 11,206.00 |
| 82–414075–1 | 10,370.00 |
| 82–414130–7 | 19,898.00 |
| 82–414395–2 | 26,681.00 |
| 82–414752–1 | 21,732.00 |
| 82–414515–4 | 19,293.00 |
| 82–414451–1 | 33,855.00 |
| 81–413879–9 | 63,529.00 |
| | $213,878.00 |