**UNITED STATES of America, Plaintiff,**

v.

**MODES, INC. & Jaikishan C. Budhrani, Defendants.**

**Court No. 89-04-00206.**

United States Court of International Trade.

Oct. 9, 1992.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, Asst. Director, Michael S. Kane, Washington, D.C., for plaintiff.

Golden, Potts, Boeckman & Wilson, Claude R. Wilson, Jr., Dallas, Tex., for defendants.

## OPINION AND ORDER

NEWMAN, Senior Judge:

### Introduction

This is an action brought by the Government to collect a civil penalty from defendants pursuant to 19 U.S.C. § 1592 (1988). The Government moves for partial summary judgment on the issue of liability for intentional falsification of invoices in connection with defendants' importations of Taiwanese jewelry. In the alternative, the Government moves for partial summary judgment on a theory of grossly negligent or negligent violations of § 1592.

Defendants oppose the Government's motion and cross-move for summary judgment on the merits and raise the statute of limitations as an affirmative defense concerning certain entries.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1582 (1988).

### Undisputed Facts

Defendant Modes, Inc. is a closely held corporation headquartered in Dallas, Texas initially created for the purpose of importing tailored clothing from Hong Kong. From 1984 to 1985 defendant Jaikishan C. Budhrani was Vice–President of Modes.

Commencing in January 1984, Modes imported "twist beads" from Itai International Co., Ltd. and Ralone Co., Ltd., Taiwanese export companies operated by Mr. Chester Chou. In accordance with an arrangement entered into between Budhrani and Chou "a month or two" after the initial entry the jewelry, on or around January 11, 1984, purchases of jewelry from the Chou companies took place under two separate invoices.

The first invoice, which accompanied the merchandise, was filed with the United States Customs Service ("Customs"). That invoice, however, stated a lower price than was actually agreed upon between the parties and ultimately paid for the jewelry. For each transaction, Modes cut a check to the exporter in the amount of the first invoice.

The second invoice for the true price of the goods was then sent by the exporter directly to Modes. This second invoice was neither filed with nor disclosed to Customs. Modes then cut a second check to the exporter in the amount of the outstanding balance of the shipment, *i.e.*, the difference between the price terms appearing on the two invoices. This double-invoicing arrangement continued from January to November of 1984.

It appears that Budhrani agreed to Chou's double-invoicing scheme because it was a necessary business accommodation to his supplier's efforts to evade Taiwanese income taxes and because the goods were duty-free. Budhrani admitted in his deposition that he knew that the double invoicing scheme was illegal. Dep. at 46, Appendix at 110.

In November 1984, Budhrani learned that Customs had initiated an investigation into the double invoicing scheme. Shortly thereafter, Budhrani discovered that his false invoices adversely impacted calculations under the Generalized System of Preferences ("GSP") when he sought the advice of counsel in connection with the

pending investigation. Budhrani thereafter discontinued the double-invoicing arrangement with Chou.

### Discussion

### I.

As a threshold matter, a motion for summary judgment is appropriate where there is no genuine issue of material fact requiring a trial and the moving party is entitled to judgment in its favor as a matter of law. USCIT R. 56(d); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987).

■ The court concludes that, on the issue of liability, partial summary judgment in favor of the Government is appropriate in this case, since the undisputed facts show that Budhrani intentionally submitted false invoices to Customs when entering the goods, deceiving the Government as to their true purchase price, and that such invoices were fraudulent and material in violation of § 1592. Defendants' affirmative defense of the statute of limitations is rejected.

### II.

On the cross-motions pursuant to CIT Rule 56 and the evidentiary and other submissions of the parties in support thereof, the court must determine whether an issue of material fact has been raised as to preclude summary judgment. This determination will be resolved by reference to the substantive law of the case, which is the statute itself, as supplemented by reasonable regulatory interpretations by Customs. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Importers are required to file true and accurate invoices with Customs. *See* 19 U.S.C. §§ 1481, 1485. Section 1485 provides, *inter alia,* that persons making an entry of goods must file a declaration under oath that the prices set forth in an invoice are true. Where it has been established that false invoices have been filed, the Government may seek to collect civil penalties for fraudulent, grossly negligent or negligent violations of the statute under § 1592, which is the principal enforcement mechanism of the customs laws for false invoicing. The relevant portions of § 1592 provide:

§ 1592. Penalties for fraud, gross negligence and negligence

(a) Prohibition.—

(1) General rule.—Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence—

(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—

(i) any document, written or oral statement, or act which is material and false, or

(ii) any omission which is material, or

(B) may aid or abet any other person to violate subparagraph (A).

Resolution of the cross-motions for summary judgment requires, therefore, that the court determine: (1) whether the false statements were *fraudulently* made; (2) if so, whether the fraudulent statements were *material;* and (3) to what extent the entries were made *by means of* the false invoices.

### A. Fraud

There is no genuine issue of fact that in connection with making entries of its jewelry, Modes submitted to Customs invoices containing false purchase prices that had a material bearing on the valuation of the goods. The Government asserts that here defendants' false invoices meet the most stringent level of culpability under § 1592, *viz.,* they were *fraudulent* in that defendants concededly entered the goods under *intentionally false* statements concerning purchase prices.

However, in support of their position that the invoices while concededly false were not "fraudulent," defendants cite a

regulation promulgated by Customs in 1984. That regulation specifically sets forth Customs' definition of fraud for purposes of § 1592:

> (3) Fraud. A violation is determined to be fraudulent if it results from an act or acts (of commission or omission) deliberately done with intent to defraud the revenue or to otherwise violate the laws of the United States, as established by clear and convincing evidence.

19 C.F.R. Pt. 171, App. B(B)(3) (1984). The court agrees with defendants that Customs' 1984 definition of fraud, as defined its regulation, is controlling as to defendants' liability for fraud in the relevant time period involved in this case. By predicating liability for fraud on clear and convincing evidence of specific forms of defendant's intent—"defraud the revenue," or the more broadly based intent, "to otherwise violate the laws of the United States"—Customs assumed a burden of proof under its regulation of more than simply showing that defendants presented to Customs an intentionally false document. *"Intent" as to consequences was made by the regulation the sine qua non of a fraudulent violation under the statute.*[1]

Defendants' liability for fraud under the first formulation of intent—to defraud the revenue—may be quickly disposed of as a matter of fact. The jewelry in question was accorded duty-free treatment under the Generalized System of Preferences ("GSP") established under the Trade Act of 1974. Pub.L. 93–618, Title V, § 501 *et seq.*, Jan. 3, 1975, 88 Stat. 2066, codified as amended at 19 U.S.C. § 2461 *et seq.*, (1988). Notwithstanding the duty-free status of the goods at the time of the entries in question, the Government contends that

false price terms on the invoices were material to an intent to defraud the revenue since pricing and valuation formed the basis of data upon which the Treasury Department relied in determining eligibility for duty-free treatment under GSP of goods such as that imported by defendant.

The substance of the Government's argument that Budhrani intended to defraud the revenues is that a statistical distortion resulting from undervaluation of duty-free imports tends to prolong eligibility for duty-free GSP treatment beyond the time at which such treatment would terminate if the true prices, and hence valuations, were reported. Thus, according to the Government, defendants, in essence, intended to defraud the Government of potential future revenues. Under this rationale, even though defendants' understatement of price on the invoices had no immediate revenue impact on the duty-free entries, the false invoices were material to loss of revenues from *future* dutiable entries of merchandise from Taiwan under the same tariff classification.

 Defendants argue that there is nothing before the court to contradict their showing that Budhrani was unaware of the GSP prior to being informed of the program during the Customs investigation in November 1984; and at the least, an issue of material fact exists as to whether Budhrani at the time he submitted the false invoices to Customs had an intent to defraud the revenues.

Under the definitional language of the regulation, the court holds that an intent to defraud the Government of potential *future* revenues from imports falls within the parameters of fraud liability under § 1592 and the regulation. However, the court

---

1. This 1984 concept of fraud was changed somewhat in 1989 when Customs promulgated the current definition which more closely follows the traditional common law criterion of fraud that requires only an intent to make a materially false statement without regard to intent as to the specific consequences of the deception. Thus, with reference to amending the 1984 regulation, Customs commented:

> By amending the definition of fraud under the guidelines, Customs merely is adhering to

the general principle applied in civil fraud cases that "the intent which becomes important is the intent to deceive, to mislead, to convey a false impression." Thus, the intent under the new definition is directed to the making of the false representation or omission, *as opposed to causing the consequences of such representation or omission (e.g., duty loss, quota violation, etc.)*

Cust.B. & D., No. 38 at 3 (Sept. 20, 1989) (T.D. 89–83).

finds no genuine issue of fact as to whether Budhrani was aware of the GSP program and the potential effect on future revenues under the program of his false invoice pricing. In short, the court finds that defendants' evidence has successfully negated intent to defraud the revenues. *See* Affidavit of Jaikishan Budhrani at 2–3.

The court does not, however, accept defendants' argument that application of the regulation to the facts of this case completely absolves them of liability for fraud since the regulation goes on to provide the broad formulation: an intent to "otherwise violate the laws of the United States." 19 C.F.R.Pt. 171, App. B(B)(3) (1984).

■ Specifically, by the double invoicing scheme defendants are accused of having intentionally violated 19 U.S.C. §§ 1481 and 1485—which require that importers file truthful invoices—and consequently, violated § 1592. Defendants' contention that they did not know that their false invoices would defraud the Government of revenues is not dispositive of whether defendants intended to violate U.S. law within the meaning of the regulation. The admittedly false invoices presented to Customs with the entries coupled with Budhrani's critical and unqualified admission in his deposition that he knew that the double invoicing scheme was not "legal" is dispositive of his liability for fraud under § 1592 pursuant to the second broad formulation for fraudulent intent under the regulation.[2]

■ Budhrani attempts to repudiate his deposition admission of the illegality of his double invoicing scheme by his subsequent affidavit statement asserting that he was unaware that false invoicing is illegal if the goods are duty-free. Affidavit of Jaikishan Budhrani at 2–3. However, where the party opposing summary judgment makes an admission of fact in response to an unambiguous question in a deposition, that party

may not thereafter defeat the motion merely by submitting an affidavit containing conclusory contradictions of the previously admitted facts. *See, e.g., Lovejoy Electronics, Inc. v. O'Berto,* 873 F.2d 1001, 1005 (7th Cir.1989); *Van T. Junkins and Associates v. U.S. Industries,* 736 F.2d 656, 657 (11th Cir.1984); *Radobenko v. Animated Equipment Corporation,* 520 F.2d 540, 544 (9th Cir.1975); *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969).

The court determines that, by asserting his ignorance of the GSP program Budhrani has put forth, at best, a feigned issue of fact concerning defendants' intent in the double invoicing scheme, as described *supra*, and that the only material fact for purposes of the instant motion is that Budhrani appreciated at the time he made entries of his goods that he was acting illegally in submitting false invoices to Customs. Further, the court concludes that as a matter of law defendants' conduct constituted actionable fraud under § 1592.

### B. Materiality

■ Whether fraudulent misrepresentations of price are material is initially an issue of law for the court. *See United States v. Daewoo Int'l (America) Corp.,* 12 CIT 889, 895, 696 F.Supp. 1534, 1540 *modified,* 13 CIT 76, 704 F.Supp. 1067 (1988); *United States v. Rockwell Int'l Corp.,* 10 CIT 38, 42, 628 F.Supp. 206, 209–210 (1986). Once again, Customs has supplied a definition that governs the transactions in question:

A document, statement, act or omission is material if it has the *potential* to alter the classification, appraisement, or admissibility of merchandise, or the liability for duty, or if it tends to conceal an unfair trade practice under the antidump-

---

2. The critical portion of Budhrani's deposition testimony is as follows:

Q: Okay. Even though you may not have understood the term GSP, or general specialized [sic] preferences, you did understand that the goods you were bringing in were duty free—
A: Yes.
Q: —meaning you did not—
A: Yes, I knew that.
Q: —have to pay duty on that?
Q: Okay. And you did know that the double invoicing scheme was not legal?
A: Yes, ma'am.
Deposition of Jaikishan Budhrani at 46, App. at 110.

ing, countervailing duty or a similar statute, or an unfair act involving patent or copyright infringement.

19 C.F.R.Pt. 171, App. B(A) (1984) (emphasis added). Defendants rely on this regulation, arguing that these false invoices are not "material" to goods entered duty-free under the GSP since the prices stated had no "potential to alter the classification, appraisement, or the admissibility of merchandise, or the liability for duty." The court cannot agree.

■ True, no duty would have been paid on defendants' jewelry imported in 1984, even had the prices been vastly *overstated.* Nevertheless, the court cannot agree with defendants' contention that the invoices impacted on neither the appraisements nor liability for duty.

Fundamentally, purchase price is highly material to the valuation of merchandise, *see* 19 U.S.C. § 1401a(b) (Transaction value of imported merchandise), and the double invoicing scheme obviously had the "potential" to alter the valuation of the goods imported in 1984. Moreover, even if erroneous appraised valuations of defendants' merchandise (caused by the double invoicing scheme) did not have the potential to affect the dutiability of the jewelry in the 1984 entries, defendants' fraud had the "potential" prospectively to impact defendants' liability for duty on future importations of jewelry from Taiwan.

Under the 1984 amendments to the Trade Act of 1974, the President conducts a periodic review of the eligibility of goods for continued duty-free treatment. 19 U.S.C. § 2464(c). In the course of this review, the total appraised value of goods imported from the beneficiary developing country in any given year is compared to either of two base figures. *See id.* If the appraised value of the goods from the beneficiary country (in this case, Taiwan) exceeds either of those two comparison amounts, preferential treatment must be withdrawn in the following year. *See Florsheim Shoe Co. v. United States,* 2 Fed.Cir. (T) 83, 92, 744 F.2d 787, 793 (Fed.Cir.1984) (presidential termination of GSP treatment mandatory under § 504(c) of Trade Act if imports

from beneficiary country exceed GSP cap under competitive needs formula).

■ Thus, viewed prospectively, a false invoice statement of price at the time of entry has the potential to alter the appraised values and, as a result, the potential to alter liability for duty on goods entering from the same country of origin and under the same classification as early as one year from the time of the false statement. *A fortiori,* defendants' fraudulent invoices *were* "material" within the scope of § 1592 and 19 C.F.R.Pt. 171, App. B(A) (1984)—a conclusion that becomes even more compelling in light of the fact that GSP eligibility for Taiwanese jewelry *was* in fact withdrawn in 1985.

The purpose of the GSP would be ill served by defendants' proposed narrow and unworkable construction of the term "material" in § 1592. Duty-free treatment under the GSP is intended to be available only until such time as the goods to be imported become competitive with domestic producers in the American market. *See* 1974 U.S.C.C.A.N. 7186, 7356–57. Thus, the logical consequence of defendants' position would be that importers could, with impunity and without offending the laws of the United States, declare false price terms to Customs, artificially extending their duty-free privileges well beyond the point where such treatment is economically justified and legally permissible. Such an irrational result is to be avoided if a fair reading of the statute and regulation defining "material" encompasses *the potential for an alteration of appraised values affecting prospective duty liability.* The court holds that § 1592 and 19 C.F.R.Pt. 171, App. B(A) (1984) may be fairly so construed, and therefore, as a matter of law defendants' fraudulent invoices were "material."

### C. *"By Means Of"*

■ Section 1592(a) requires that the false document be the "means of" the entry or introduction of merchandise into the United States. This provision simply requires that the false document or information be submitted to Customs in connection

with the entry or importation of the merchandise.

Under defendants' construction of the "by means of" language, the false representation must necessarily be made in connection with merchandise that, but for that representation, would not be admissible. In support of their position, defendants rely upon *United States v. Teraoka*, 669 F.2d 577 (9th Cir.1982) and its recent progeny, *United States v. Corcuera–Valor*, 910 F.2d 198, 199–200 (5th Cir.1990). *See also, United States v. Ven–Fuel, Inc.*, 602 F.2d 747, 753 (5th Cir.1979), *cert. denied sub nom. Ven–Fuel, Inc. v. Duncan*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980); *United States v. Rose*, 570 F.2d 1358, 1363 (9th Cir.1978).

The *Teraoka* line of cases involved interpretation of similar language in the criminal analogue to § 1592, which is to be found in 18 U.S.C. § 542 (1988). In *Teraoka*, the Ninth Circuit held that importation of goods violated § 542 only where the false statements resulted in the importation of merchandise that was otherwise excludable. 669 F.2d at 579. This construction of § 542 assumed that the purpose of the section is to exclude from the commerce of the United States goods that cannot lawfully be imported, a conclusion that other circuits have declined to reach. *See, e.g., United States v. Bagnall*, 907 F.2d 432, 436 (3rd Cir.1990) (purpose of § 542 is to preserve the integrity of process by which foreign goods are imported into the United States); *United States v. Ven–Fuel*, 758 F.2d 741, 762 (1st Cir.1985) (convictions regularly upheld where false statements made in connection with generically importable goods).

Defendants' attempt to impose the Ninth Circuit's restrictive reading of the "by means of" language on § 1592 is without merit. The *Teraoka* rationale has been widely rejected within the civil penalty context of § 1592. As the court observed in *United States v. F.A.G. Bearings Corp. Ltd.*, 8 CIT 201, 615 F.Supp. 562 (1984), a reading of the statute permitting civil penalties only where the fraudulent statement concerned otherwise excludable goods

"would emasculate [§ 1592], depriving the United States Government of one of its more effective and widely-used customs civil enforcement statutes." 8 CIT at 209; 615 F.Supp. at 569. *See also, Daewoo*, 12 CIT at 897, 696 F.Supp. at 1542 ("[t]he bounds of § 1592 reach to false statements and practices in relation to lawfully imported merchandise."); *Ven–Fuel*, 758 F.2d at 762 (restrictive interpretation of "by means of" language would render § 1592 meaningless in a large number of cases). Defendants' proposed construction of the statute is further defeated by comparison to judicial interpretation of similarly worded enforcement provisions under previous customs statutes. Imposition of penalties under those statutes, which contained the same "by means of" language, was predicated upon false statements concerning value, origin, quantity and price in connection with the entry of goods which were not otherwise excludable. *See United States v. Twenty-five Packages of Panama Hats*, 231 U.S. 358, 360, 34 S.Ct. 63, 64, 58 L.Ed. 267 (1913).

Finally, defendants' interpretation would accomplish an absurd result. If liability were confined to those cases involving restricted or excludable merchandise, importers would be at liberty to submit false valuation for all other goods without triggering civil liability under the statute, thereby avoiding the payment of duty in particular and the obligation to comply with American import laws generally. *See Daewoo*, 12 CIT at 895, 696 F.Supp. at 1540 (overvaluation of admissible goods to avoid trigger price mechanism and imposition of antidumping duties violates § 1592).

In sum, the court rejects defendants' interpretation, finds that there is no genuine factual dispute that the false invoices were presented to Customs in connection with the importation and entry of jewelry, and holds that, as a matter of law, such invoices fall within the scope of § 1592.

### III.

█ The final issue to be resolved is whether the statute of limitations bars recovery of fraud penalties by the Govern-

ment for certain entries. Actions brought under § 1592 are subject to a five-year statute of limitations, which provides, in relevant part:

> No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered.

19 U.S.C. § 1621 (1988). Section 1621 adopts the discovery rule in fraud cases, which tolls the limitations period until the time the fraud is discovered. Thus, under the discovery rule the statute of limitations is tolled until the date when the plaintiff first learns of the fraud or is sufficiently on notice as to the possibility of fraud to discover its existence with the exercise of due diligence. *United States v. R.I.T.A. Organics, Inc.*, 487 F.Supp. 75, 77 (N.D.Ill. 1980).

Defendants argue that the discovery rule is unavailable in this case because the Government failed to plead its compliance with the statute of limitations in the complaint.[3] Consequently, defendants assert that the action is time barred as to all entries of twist beads more than five years prior to the commencement of the action on April 20, 1989.

The parties are in agreement that the action is timely as to all entries filed after April 25, 1984, and liability for fraud in connection with those entries is accordingly unaffected by defendants' statute of limitations defense. The Government identifies 18 of the 74 shipments as having been entered in the period between January 11, 1984 and April 20, 1984. As to those entries, the Government takes the position that the statutory five-year period was tolled until August 23, 1984 because Customs did not discover the double-invoicing scheme until that date. If the latter statement is factual, then the statutory period

was tolled until the date of discovery, and when the Government finally did bring this action on April 20, 1989, it was timely under the statute of limitations with approximately four months to spare.

In support of this position, the Government submitted the affidavit of Mr. Harvey McFadden, an Import Specialist with Customs. In substance, the McFadden affidavit indicates that on August 23, 1984 he discovered the double invoicing scheme in connection with the entry of twist beads that had taken place on April 27, 1984.

According to McFadden, after the April 27 entry, Modes submitted a corrected invoice on May 23, 1984; submission of corrected invoices was routinely required from importers and customhouse brokers, thereby making May 23, 1984 an unlikely date for discovery of fraud; his suspicion was not triggered at that point in time because he thought that the second invoice was sent to him by mistake; and the usual practice is to set corrected invoices aside and "associate" them with entry files when time permits. Thus, according to McFadden, it was not until August 23, 1984 that he matched up the entry file with the corrected invoice and discovered a discrepancy in value information. In short, taking the Government's version of the facts at face value it would seem that Customs neither knew, nor with the exercise of due diligence could have known that Modes and Chou were double-invoicing shipments of jewelry until August 23, 1984.

For the purposes of a summary judgment motion, the Government's uncontroverted McFadden affidavit would ordinarily be dispositive of the date of discovery issue. However, defendants contend that the Government was required to plead the date of discovery in the complaint. Accordingly, argue defendants, the Government should be precluded from relying on the discovery rule for the earlier entries. This position suggests that, although the Gov-

---

**3.** The complaint did not specify when or how the Government first discovered the double-invoicing scheme. The Government first alleged the date of discovery in reply to a statute of limitations defense set forth in defendants' brief in opposition to the Government's motion for partial summary judgment. The Government submitted an affidavit from an Import Specialist employed by Customs detailing the circumstances by which the Government discovered the fraud. The pertinent details are set forth, *infra.*

ernment may not have been able to discover defendants' fraud with due diligence until well after the fraud was initially committed, the running of the statutory period should not be deemed to have been tolled because the Government failed properly to invoke the protection of the rule in its complaint. This presents an issue of law for the court to resolve.

Defendants cite *United States v. Gordon*, 7 CIT 350 (1984) for the proposition that the Government's failure to plead the date of discovery of the alleged fraud in the complaint totally deprives the Government of the benefit of the discovery rule, thereby limiting recovery to those transactions that occurred within five years prior to the commencement of the action. The Government responds that, notwithstanding the failure to plead the date of discovery in the complaint, it may rely upon the discovery rule because defendants are not prejudiced at this stage of the litigation by defendants' tardy reliance on the date of discovery to toll the statute of limitations. *See, United States v. Thorson Chem. Corp.*, —— CIT ——, 795 F.Supp. 1190, 1194, n. 5 (1992) (defendant not prejudiced when it had opportunity to file opposing brief after Government filed motion to strike affirmative defense of statute of limitations); *United States v. Neman*, —— CIT ——, 784 F.Supp. 897, 898 (1992).

The court agrees with the Government's contention that its tardy reliance on the discovery rule does not bar it from the benefit of the rule. Such was not the result in *Gordon* or *Thorson*, and it is unwarranted in this case. Consequently, absent any claim or showing of prejudice to defendants due to the Government's failure to plead the date of discovery in the complaint coupled with no attempt by defendants to controvert the McFadden affidavit, the court finds no genuine issue of fact concerning the date of discovery—August 23, 1984—and hence finds that this action was filed within the statute of limitations as to all the subject entries.

### Conclusion

ORDERED that the Government's motion for partial summary judgment is GRANTED as to all entries in this case; and it is further

ORDERED that defendants' cross-motion for summary judgment is denied.